STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. RUBIN CARTER AND JOHN ARTIS, DEFENDANTS-APPELLANTS.

Argued January 12, 1976—Decided March 17, 1976.

422

Mr. *Myron Beldock,* of the New York bar, argued the cause for appellant Rubin Carter (*Mr. Beldock,* of counsel; *Mr. Beldock, Mr. Lewis M. Steel, Ms. Kathleen Wresien* and *Ms. Nancy S. Baxter,* of the New York bar, on the brief; *Messrs. Busch & Busch,* attorneys).

Mr. *Lewis M. Steel,* of the New York bar, argued the cause for appellant John Artis (*Mr. Steel,* of counsel; *Mr. Steel, Mr. Myron Beldock, Ms. Kathleen Wresien* and *Ms. Nancy S. Baxter,* of the New York bar, on the brief; *Mr. Jeffrey E. Fogel,* attorney).

Mr. *Burrell Ives Humphreys,* Passaic County Prosecutor, argued the cause for respondent (*Mr. John P. Goceljak,* Assistant Prosecutor, of counsel and on the brief; *Mr. Humphreys,* Passaic County Prosecutor, attorney).

Mr. *Robert M. Dangel* argued the cause for *amicus curiae* American Civil Liberties Union of New Jersey (*Mr. Dangel* and *Mr. Martin L. Haines,* of counsel, *Messrs. Haines, Schulze, Wood & Tapper,* attorneys).

The opinion of the Court was delivered by
SULLIVAN, J. In May 1967 defendants Rubin Carter and John Artis were convicted of first degree murder on a three-count indictment and were sentenced to terms of life imprisonment. Their convictions were affirmed by this Court, *State v. Carter,* 54 *N. J.* 436 (1969). The United States

Supreme Court denied a petition for a writ of *certiorari: Carter v. New Jersey*, 397 *U. S.* 948, 90 *S. Ct.* 969, 25 *L. Ed.* 2d 130 (1970).

The present proceedings seeking a new trial were commenced in October 1974. The relief sought was essentially bottomed on three grounds. First, it was claimed that the State's key identification witnesses had recanted their trial testimony insofar as the identification of defendants was concerned. Second, defendants charged that at trial the prosecution knowingly permitted these witnesses to give false testimony that no promises had been made to them except for promises of protection from defendant Carter's friends. Third, it was claimed that the State suppressed and failed to disclose material evidence which would have tended to exculpate defendants. Following hearings in the matter, the trial court denied the several motions submitted by defendants and held that no basis for the grant of a new trial had been shown. *State v. Carter*, 136 *N. J. Super.* 271 and 596 (Cty. Ct. 1974).[1] We consider each of these contentions in turn, and, for reasons hereinafter set forth, we conclude that defendants are entitled to a new trial.

The factual background of the case, an understanding of which is necessary for consideration of the issues now presented, was summarized in this Court's previous opinion, *supra*, 54 *N. J.* at 439–441 as follows:

At about 2:30 A.M. on June 17, 1966 two men entered the Lafayette Bar and Grill in the City of Paterson. One man held a .32-caliber revolver, the other a 12-gauge shotgun. Their motive was obscure, no doubt because events moved so rapidly. We gather from the testimony of the sole surviving victim that the bartender saw the armed men as they entered and threw a bottle at them,

---

[1]After the trial court filed its opinion denying the motion for a new trial, defendants retained new counsel who presented motions to reopen and reargue the matter as well as a motion for a new trial bottomed on additional newly discovered evidence. Following a hearing, the trial court filed a second opinion denying all of the subsequent motions.

precipitating the shooting before a word was said. The bartender was killed instantly, as was also one of the patrons. Another patron, Mrs. Tanis, who suffered multiple wounds, died four weeks later. The lone survivor, also a patron, was shot in the head. His ability to tell what happened was obviously impaired; he could contribute little more than that the armed men were Negroes. The State failed in its effort to prove a dying declaration by Mrs. Tanis. We know only that she and also the surviving patron were unable to identify either defendant, but the testimony does not suggest that either patron was able to say affirmatively that the defendants were not the offenders.

Mrs. Valentine, who lived above the tavern, was awakened by the shots. She went to the window and saw two men run from the sidewalk in front of the tavern to a white automobile parked across the street, about a car-width from the curb. Mrs. Valentine could not see their faces but observed that they were Negroes, that the license plate had a dark background with gold or yellow lettering, and that the rear lights were triangular in shape tapering toward the center. She hurried to the tavern, where she met one Alfred Bello, who urged her not to enter. She nonetheless did, saw the gory scene, returned to her apartment, and telephoned the police.

Alfred Bello was a key witness for the State. He and Arthur Dexter Bradley were in the area on a criminal mission of their own. Bradley was attempting to break into a building about two blocks away while Bello was at the intervening intersection looking out for the police. Bello ran out of cigarettes and was walking to the tavern to buy some when he heard the shots. As he neared the tavern, two men, Negroes, came toward him, one with a shotgun and the other with a pistol. They were talking loudly and laughing. When Bello realized they were not detectives, he took off and ducked into an alleyway. Presently a white car passed by. Bello recognized it as a 1966 Dodge and noted it had New York license plates. Bello entered the tavern, and seeing the dead and the dying, he went to the cash register to obtain a dime to call the police. The sight of money was too much for Bello who, explaining he was a thief, admitted he scooped some bills from the register. He left the tavern and handed the money to Bradley who, having heard the shots, had started toward the scene. Bello returned to the tavern. He called, or had already called, the police, and when they arrived, he flagged them down.

At 2:34 A.M. patrol cars were alerted for a white car with two Negro occupants. At 2:40 A.M. Sergeant Capter and his colleague stopped a white car with three Negro occupants. Defendant Artis was driving and defendant Carter was in the rear seat. Carter, a professional pugilist, was well known to Sergeant Capter. After checking the registration, the officers permitted the car to proceed. The officers then went to the tavern, and learning that Mrs. Valentine and Bello had given the additional information that the car

had out-of-state plates and that the rear lights looked like "butter-flies," they took off to search for the car they had stopped, for that car had New York plates and its rear lights answered the description given by Mrs. Valentine and Bello.

The car was located. Artis and Carter were then the only occupants. They were ordered to drive to the tavern in an escort of police cars. When they arrived, Mrs. Valentine identified the car as the one she had seen. By then a large crowd had gathered. The car was taken by the police to headquarters where it was impounded. At 3:45 A.M. a search of the car yielded a live .32-caliber S. & W. long bullet, found on the floor under the right front seat, and a live 12-gauge shotgun shell, found in the trunk under boxing gear. * * *

Both Carter and Artis were questioned early that morning. Both denied involvement. A detective was permitted to testify to each defendant's account of where he had been that night. * * * Both defendants were released that morning. On June 29, twelve days later, both Artis and Carter testified voluntarily before the Grand Jury after signing appropriate waivers.

Defendants were not arrested again until October, when Bello and Bradley, both involved in other criminal charges, provided evidence directly incriminating the defendants. Bello said it was Carter who carried the shotgun and Artis who held the pistol; that he recognized both at once when he was confronted by them outside the tavern, and that he had withheld this information because of his own criminal activities that night and his fear of retaliation. Bradley, who also saw both men, testified that Carter was one of them. He was unable to say whether Artis was the other.

Both Carter and Artis testified. They produced a number of witnesses in an effort to place themselves at a bar at the time of the murders. It, however, was virtually impossible to establish an alibi, for at all times defendants were concededly within minutes of the murder scene and the moment of the killings could not be established precisely. * * *

Bello and Bradley were the only witnesses who had identified defendants as the two men seen fleeing the scene of the crime. Their testimony therefore was crucial to the State's case. The motions for a new trial were addressed, essentially, to the credibility of the trial testimony of these two witnesses.

At the new trial hearings Bello and Bradley, each under oath, repudiated their identifications of defendants made at trial. In his recantation testimony Bello admitted that he was present outside the Lafayette Grill when the shooting

took place and that he saw two black men flee the scene. He said, though, that he did not see their faces and could not identify them and that he had lied at the trial when he identified the defendants as the two men.

Bradley, in his recantation, while he admitted his presence in the alley for a criminal purpose, now said he had remained in the alley and had not heard any shots nor did he see anyone until Bello returned. He testified that Bello gave him some money and told him to leave. He stated that his trial testimony implicating Carter was completely fabricated.

Courts generally regard recantation testimony as suspect and untrustworthy. 58 *Am. Jur.,* 2d, *New Trial,* § 175, p. 391. Consequently, the burden of proof rests on those presenting such testimony to establish that it is probably true and the trial testimony probably false. *State v. Baldwin,* 47 *N. J.* 379, 400, *cert.* den., 385 *U. S.* 980, 87 *S. Ct.* 527, 17 *L. Ed.* 2d 442 (1966). We noted in *State v. Puchalski,* 45 *N. J.* 97, 107–108 (1965) that:

The test for the judge in evaluating a recantation upon a motion for a new trial is whether it casts serious doubt upon the truth of the testimony given at the trial and whether, if believable, the factual recital of the recantation so seriously impugns the entire trial evidence as to give rise to the conclusion that there resulted a possible miscarriage of justice. His first duty is, therefore, to determine whether the recanting statement is believable.

The judge who presided at defendants' trial also presided over the new trial hearings. He found that the recantations were "patently untrue" and "unbelievable" and set forth with particularity the several factors which led him to this conclusion. He concluded that the "ring of truth" was totally absent in the recantations of Bello and Bradley.

The determination of the credibility or lack thereof of recantation testimony is peculiarly the function of the trial judge who sees the witnesses, hears their testimony and has the feel of the case. Manner of expression, sincerity, candor and straightforwardness are just some of the intan-

gibles available to the trial judge in evaluating the credibility of recantation testimony. A reviewing court, not having the same advantage should ordinarily defer to the trial judge's findings on this sensitive issue as long as the proper criteria are used. Here the correct standards were applied and we will not interfere with the findings that the recantation testimony herein was "patently untrue" and "unbelievable."

The second ground urged by defendants is that at the trial the State knowingly permitted Bello and Bradley to testify falsely that no promises, except for protection, had been made to them by the State in conjunction with their testimony. Such testimony, if true, frustrated defendants' efforts to argue that there may have been some inducement for Bello's and Bradley's testimony identifying defendants.

At the new trial hearing it was established that certain representations had been made to both Bello and Bradley by the State as to favorable or sympathetic treatment to be given them in connection with their problems with the law. As to Bello, this information came to light through the disclosure of a tape recording of an interview between Bello and two detectives working on the case, one of whom, Lt. DeSimone, was a member of the prosecutor's staff. It was shown that three days prior to October 14, 1966, the date on which Bello gave a written statement to the authorities identifying defendants as the two men he had seen fleeing the scene of the Lafayette Grill murders, he had been interviewed by Lt. DeSimone and Sgt. Mohl. A tape recording of the October 11 interview was made but it is not clear whether defense counsel, at trial, knew of the existence of this tape.[2] However, it is undisputed that the defense was unaware of the contents of the tape until the October 1974 motion.[3]

---

[2] At trial Sgt. Mohl testified that prior to the questioning of Bello a tape recorder was secreted under the desk.

[3] Prior to trial the defense had made numerous motions for discovery of any exculpatory material in the possession of the State.

█ The record indicates that the assistant prosecutor who presented the State's case knew there was a tape of the October 11 interview with Bello but was unaware of its contents. However, Lt. DeSimone, obviously had such knowledge since he had participated in the interview. He was a member of the prosecutor's staff in charge of the investigation and also participated in the trial of the case, being present at counsel table throughout the trial. Under these circumstances his knowledge can be imputed to the prosecutor. *Imbler v. Craven*, 298 *F. Supp.* 795 (C. D. Cal. 1969), aff'd, 424 *F.* 2d 631 (9. Cir.), *cert.* den., 400 *U. S.* 865, 91 *S. Ct.* 100, 27 *L. Ed.* 2d 104 (1970) ; See *Giglio v. United States,* 405 *U. S.* 150, 92 *S. Ct.* 763, 31 *L. Ed.* 2d 104 (1972).

The transcript of the October 11 tape is significant in several respects. It shows that Bello not only was promised protection, but that Lt. DeSimone told Bello he would do everything within his power to have Bello's parole transferred to another State so that he could make a fresh start. In answer to Bello's inquiry as to whether he could "get my parole dropped or something," DeSimone said "Well, that I can't promise. In other words I'm taking this a step at a time." However, after briefly referring to Bello's parole officer, DeSimone then added "Hear me now. I assure you I will go to the top people in the State of New Jersey. I promise you this."

During the interview Bello was also assured that nothing would be done about his having been in the area for the purpose of breaking and entering. It was also suggested that he would not be prosecuted for having taken money from the cash register of the Lafayette Grill when he entered the premises immediately after the shooting. DeSimone said they were trying to solve a triple murder, not "pick on every little thing."

As to Bradley, it was disclosed for the first time at the new trial hearing that, prior to his having given the police

In response it was represented to the court and to defense counsel that any statements withheld were, at best, neutral.

a written statement identifying Carter, Lt. DeSimone had not only promised Bradley protection but also represented that he would inform every prosecutor's office in the State where there were pending charges against Bradley of his having testified as a State's witness in a triple homicide case. The purpose of this, DeSimone said, was to have the information included in the presentence report for consideration by the sentencing judge. DeSimone also revealed that the assistant prosecutor who tried the case was aware of these promises.

The judge after reviewing the new trial testimony found that the representations made by Lt. DeSimone were not concrete promises. He therefore concluded that the responses of both witnesses that they had been promised nothing except protection, in context, had a limited connotation and did not constitute clear perjurious testimony. The judge also noted that the prosecutor had attempted at trial to disclose the actual promises made to Bradley but had been prevented from doing so because of objections by defense counsel. This in the opinion of the judge was a trial tactic by defense counsel who was "apparently * * * satisfied to have the jury consider the credibility of the witness on the basis of the existence of the criminal charges and the effect on his testimony of the *hope* of reward." *State v. Carter, supra,* 136 *N. J. Super.* at 299. Based in significant part on the foregoing reasoning, the court dismissed the claim that the State had permitted Bradley to give perjurious testimony.

We find that the trial judge's evaluation of the foregoing evidence was erroneous and that his application of the relevant legal principles was too restrictive. Regardless of whether the representations made to Bello by Lt. DeSimone and Sgt. Mohl, as disclosed in the October 11 tape, can be characterized as promises for the purpose of proving perjury, it is clear that they could have motivated Bello to testify favorably for the State. Had the defense been furnished with the tape before trial, these representations

could have been used to conduct a more effective cross-examination of Bello as to a possible motive for his testimony.

The same rationale applies to Bradley. DeSimone's assurances that he would relay Bradley's cooperation with the State to the appropriate authorities obviously was intended to convey to Bradley the notion that he could expect favorable treatment as to his own criminal involvements. Therefore when Bradley testified that no promises had been made to him except that of protection, the trial prosecutor, having knowledge of DeSimone's assurances to Bradley, had an obligation to disclose this information to the court and to defense counsel. Defense counsel had been led to believe that Bradley had been promised only protection from retaliation by Carter's friends; understandably, he sought to keep any reference to such promise to a minimum. Accordingly, when the prosecutor attempted to question Bradley further about promises which had been made to him, the defense sought to block what it anticipated would be a further reference to promises of protection. Had the prosecutor intended to disclose that promises of favorable treatment had also been made to Bradley, he should have so stated. Were this done, for example at side bar, defense counsel obviously would have withdrawn his objection to such testimony. Such disclosure might well have affected the jury's assessment of Bradley's credibility. At the least, it would have afforded defense counsel the opportunity to cross-examine more effectively as to a possible ulterior motive for Bradley's testimony identifying Carter.

In addition to contending that the transcript of the October 11 tape demonstrated that Bello had committed perjury when he testified that no promises had been made to him other than that of protection, defendants as a third ground argued that the State's failure to disclose the contents of the tape constituted a withholding of evidence which would have materially affected the credibility of Bello's trial identification. Disclosure of the offers of favorable treatment made to Bello would have enabled defense counsel to argue

that there may have been some inducement for Bello's identification of defendants at trial.

Also, the transcript of the tape shows that in the beginning Bello was unable to identify Artis as one of the two men and was not sure of Carter. He was also uncertain of the make of the white car used by the gunmen which he had seen driving slowly through the area and later parked on the street. However, as the interview progressed, and after DeSimone had given assurances that Bello would receive favorable or sympathetic treatment, Bello became more positive in his identification of Carter and Artis and the car in which they had been riding. Defendants therefore contend that the tape recording would have been critical in attacking the certainty and reliability of Bello's trial identifications.

The trial judge rejected the contention that the failure of the prosecution to disclose the October 11 tape and provide the defense with a transcript of it constituted a suppression of exculpatory evidence.[4] The court found that the tape did not contain any exculpatory evidence as such and, at best, was a tool which could have been used by the defense in cross-examination for credibility purposes. The judge concluded that the tape was a matter of discovery under the then court rule and, even if it should have been furnished to the defense before trial, this was an issue cognizable only on direct appeal or post-conviction application within five years. The alleged deprivation, he held, did not reach the level of an infirmity affecting the due process requirement of a fair trial.

The withholding of material evidence favorable to a defendant is a denial of due process and the right to a

---

[4]During the new trial hearings and in the course of arguments before this Court, defendants have adverted to other materials in the State's possession as being allegedly suppressed. In view of the ground upon which we rest our decision we find it unnecessary to consider the other items presented by defendants.

fair trial irrespective of the good faith or bad faith of the prosecution. *Brady v. Maryland,* 373 *U. S.* 83, 83 *S. Ct.* 1194, 10 *L. Ed.* 2d 215 (1963). When the credibility of a State's witness may well be determinative of guilt or innocence, the jury is entitled to know, and the State has the obligation to disclose, material evidence affecting such credibility. *Giglio v. United States, supra.* In *State v. Taylor,* 49 *N. J.* 440 (1967) this Court reversed a conviction of murder and ordered a new trial, holding that the State had an obligation to disclose a promise of leniency made to a co-conspirator, who testified as a State's witness, when proper inquiry raised the question. The State's obligation to disclose to defense counsel information it possesses or materials in its file is not limited to evidence that affirmatively tends to establish a defendant's innocence but would include any information material and favorable to a defendant's cause even where the evidence concerns only the credibility of a State's witness. *State v. Vigliano,* 50 *N. J.* 51, 60 (1967). See *Napue v. Illinois,* 360 *U. S.* 264, 79 *S. Ct.* 1173, 3 *L. Ed.* 2d 1217 (1959).

In this connection, the focus of inquiry should not be so much on prosecutorial good faith or possible misconduct, or defense inadvertence, but rather on the essential fairness of the trial. Whether the State has an obligation to disclose in the absence of a proper inquiry depends, basically, on the materiality of the subject matter. *United States v. Agurs,* 167 *U. S. App. D. C.* 28, 510 *F.* 2d 1249, 1252–1253, *cert.* granted, —— *U. S.* ——, 96 *S. Ct.* 390, 46 *L. Ed.* 2d 301 (1975). One standard that has been applied is whether the undisclosed evidence, if it had been presented to the jury, might have led the jury to entertain a reasonable doubt about defendant's guilt. *Levin v. Clark,* 133 *U. S. App. D. C.* 6, 408 *F.* 2d 1209, 1212 (1967). Other cases express it in terms of a "reasonable possibility," *e. g., Barbee v. Warden, Maryland Penitentiary,* 331 *F.* 2d 842, 847 (4 Cir. 1964), or "significant chance," *e. g., United States v. Fried,* 486 *F.* 2d 201, 203 (2 Cir. 1973), *cert.* den.,

416 *U. S.* 983, 94 *S. Ct.* 2385, 40 *L. Ed.* 2d 759 (1974), that the undisclosed evidence could have induced a reasonable doubt. *See also United States v. Seijo,* 514 *F.* 2d 1357, 1364 (2 Cir. 1975) (significant chance); *United States v. Bowles,* 159 *U. S. App. D. C.* 407, 488 *F.* 2d 1307, 1314 (1973), *cert.* den., 415 *U. S.* 991, 94 *S. Ct.* 1591, 39 *L. Ed.* 2d 888 (1974) (tend to exculpate); *United States ex rel. Dumas v. Patterson,* 382 *F. Supp.* 217, 220 (S. D. N. Y. 1974) (might have influenced verdict).

During the course of a criminal investigation and preparation for trial, the State accumulates a large quantity of raw data. Much of this information or material can be fairly characterized as lacking in any real probative value. As to such material, ordinarily, the State would have no obligation to disclose absent proper inquiry. *United States v. Keogh,* 391 *F.* 2d 138, 148 (2 Cir. 1968). In the present case, though, both the October 11 tape and the promises made to Bradley clearly possessed the capacity to have affected the jury's evaluation of the credibility of Bello's and Bradley's identification testimony. The State, therefore, had the obligation to disclose, even absent inquiry.

We conclude from the foregoing that defendants' right to a fair trial was substantially prejudiced so that the judgment of conviction must be vacated and a new trial ordered.

*For reversal and remandment*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN PASHMAN, CLIFFORD and SCHREIBER and Judge CONFORD—7.

*For affirmance*—None.