**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-0409-19
                A-2252-19

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JORGE ALVARADO,

     Defendant-Appellant.

_____

Argued February 11, 2021 - Decided September 1, 2021

Before Judges Ostrer, Accurso, and Vernoia.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 03-07-1190.

Jorge Alvarado, appellant, argued the cause pro se.

Joseph E. Krakora, Public Defender, attorney for appellant in A-0409-19 (Karen A. Lodeserto, Designated Counsel, on the brief).

Stephanie Davis Elson, Assistant Prosecutor, argued the cause for respondent (Esther Suarez, Hudson County Prosecutor, attorney; Stephanie Davis Elson, on the briefs).

Appellant filed a pro se supplemental brief in A-0409-19.

PER CURIAM

In these two matters, calendared back-to-back and consolidated for our opinion, defendant Jorge Alvarado appeals in A-0409-19 from the denial of his first petition for post-conviction relief (PCR) following our remand for an evidentiary hearing, and in A-2252-19 from the denial of his second petition, filed while the first was pending, based on the United States Supreme Court's opinion in McCoy v. Louisiana, 138 S. Ct. 1500 (2018). We affirm both decisions.

This case has a long procedural history; indeed, this is the fourth opinion we've written over the course of thirteen years. Defendant was convicted in 2004 of the murder of seventeen-month-old Jan Carlos Torres, the son of his girlfriend Maria del Carmen Torres. In our first opinion affirming defendant's conviction on direct appeal, State v. Alvarado (Alvarado I), No. A-6010-05 (App. Div. Mar. 6, 2008) (slip op. at 1-6), we sketched the facts the State presented at trial. A pediatric forensic pathologist from the State's Regional Medical Examiner's Office testified the child died from suffocation, most likely

caused by the squeezing or compression of the child's chest.  Id. at 3-4.  The expert testified

> [t]he injuries he found were not consistent with punching; rather, they were consistent with pressing or placing pressure on the child.  Further, he found that rather than one mechanism, three mechanisms or steps were involved on the day of the death:  the child had been squeezed in the chest, pushed up on the face, and injured on his left thigh.  The doctor estimated that it would take roughly one minute for the child to die with consistent squeezing.  Death would be slower and more painful if the compression stopped before death.
>
> [Id. at 4.]

The pathologist also testified the child was a victim of battered child syndrome "on the basis that the injuries were repetitive (occurred on more than one occasion) and could not have occurred accidentally."  Id. at 3.  The postmortem exam revealed a rib fracture suffered a month or so before the child's death, and more recent bruising.  Id. at 3-4.  The pathologist could not say, however, "whether the child had been injured at two separate times or more times than that."  Id. at 4.

Although both defendant and the child's mother had been indicted for murder, defendant did not dispute that he was the one alone with the child in the hours before his death.  Id. at 2, 11. Defendant did not testify, but the trial record contains several statements attributed to him about what happened.  Id. at 3.

3

In his statement to the police, defendant said he "pressed the child to his chest when the baby began to cry," laying him on the bed when he quieted. Id. at 2. He claimed he did not intend to kill the child, and said his bruises were the result of a struggle defendant had with the child's mother when she had tried to take the baby from him the previous night. Id. at 2-3. An ex-girlfriend of defendant's claimed he told her he was playing with the baby, tossing him in the air, when defendant slipped and couldn't catch him. Id. at 3. Finally, a fellow inmate in the jail testified defendant said he slammed the baby into the wall and punched him in the chest when he wouldn't stop crying, "but miscalculated, causing the baby to hit the bedpost and fall to the floor." Ibid.

Following an N.J.R.E. 104 hearing, the child's mother, Torres, who had by then pleaded guilty to endangerment, was allowed to testify about harm she claimed defendant had inflicted on the baby on prior occasions. Id. at 4. She testified she found bruises on the boy after he'd been in defendant's care and once found the baby with a bloody mouth, which defendant said resulted from the baby hitting himself with a toy. Ibid. She also claimed she once "discovered hot sauce on the nipple to the baby's bottle," which, according to her, defendant admitted doing "as a practical joke." Id. at 4-5. She testified about another time

A-0409-19

when she "found melting ice cubes in the baby's diaper after defendant had left for work." Id. at 5.

We affirmed defendant's conviction, rejecting his arguments under N.J.R.E. 404(b) and State v. Cofield, 127 N.J. 328, 338 (1992), that the judge erred in allowing the State to introduce Torres's testimony that defendant had previously assaulted the child; in instructing the jury on that evidence; and in failing to give a limiting instruction about the use the jury could make of the guilty plea entered by Torres. Id. at 4-13. With regard to the 404(b) evidence, we noted the trial judge's finding that

> [w]ithout this testimony, [he] could see a reasonable juror wondering, hmm, was this a mistake, was [defendant] just trying to be quiet with the baby. Was there a tug-of-war between mom and Mr. Alvarado or was there something more and it is probative to the issue of knowledge and intent which goes to the charge of murder. Knowledge, intent and purpose.
>
> [Id. at 8.]

While acknowledging the evidence was certainly prejudicial, we noted "[e]vidence that is highly inflammatory may still be admitted where its probative value outweighs its prejudicial effect," relying on State v. Cusick, 219 N.J. Super. 452, 464-65 (App. Div. 1987), and agreed with the trial judge that

A-0409-19

Torres's evidence "was material on the question of whether the injuries to the child were intentional or accidental." Id. at 8-9.

The Supreme Court denied defendant's petition for certification. State v. Alvarado, 195 N.J. 521 (2008), and defendant's federal habeas petition was deemed untimely, Alvarado v. D'Ilio, No. 15-3878 (SRC) (D.N.J. Aug. 23, 2016), aff'd sub nom. Alvarado v. Adm'r N.J. State Prison, No. 16-3798, 2017 U.S. App. LEXIS 20661 (3d Cir. Sept. 11, 2017).

In our second opinion, State v. Alvarado (Alvarado II), No. A-0861-12 (App. Div. May 1, 2014), we addressed defendant's petition for PCR alleging ineffective assistance of trial and appellate counsel, which the trial court had denied in 2012 without an evidentiary hearing. We affirmed the decision dismissing defendant's claims relating to the performance of his trial counsel, reversed as to the claims defendant raised regarding the representation he was provided on appeal, and remanded for an evidentiary hearing. Id. at 22. The Supreme Court again denied defendant's petition for certification. State v. Alvarado, 220 N.J. 42 (2014).

Defendant's claims of ineffective assistance of appellate counsel were based on a letter he received from Torres six months after the end of defendant's trial while he was awaiting sentencing. Torres was at the time serving her own

6

prison sentence.  Quoting a key passage, we noted Torres wrote to defendant

that she

> was always very stern with the poor boy, that hurts me a lot, but I think you were guilty, because you always liked to leave me alone and you left with your friends and I came to think that you had someone else, that made me mad, very angry, Luis, you have no idea "yes" I punished that boy, but it was not to kill him, I knew he had several black and blue marks, and that is why they put me in jail, because I had said I knew of the blows and the black and blue marks, and by not [calling] the police, I know, you did not know about it, but because of that the prosecutor asked me to give the last statement, so they could find you guilty, as I said, I had no other option, I had to do something to save myself, I did not want it, but if I did not do it, the prosecutor would not take the charges away from me, forgive me.  Now, I know you are thinking in appealing your case, that means if you do it, perhaps I had to testify again and I will have to say same thing, because of the deal with the prosecutor.  Luis, it was not easy for me to take the decision of writing you, but I feel that everything is happening in someway is my fault, I know you were right in willing to go to trial and to know how everything happened and where all these blows came from, the broken rib that [he] had for several months.

[Alvarado II, slip op. at 19-20.]

Defendant claimed the letter was a recantation of Torres's testimony, and

he moved, with new counsel, for a new trial based on newly discovered

evidence.  The judge denied the motion without an evidentiary hearing, finding

Torres's trial testimony "extremely credible and straightforward."  The judge

7

stated he didn't "find her 'recantation' to be credible," and indeed didn't "even find it to be a recantation." He denied the motion, finding defendant had not carried his burden under State v. Carter, 85 N.J. 300, 314 (1981) (holding "to qualify as newly discovered evidence entitling a party to a new trial, the new evidence must be (1) material to the issue and not merely cumulative or impeaching or contradictory; (2) discovered since the trial and not discoverable by reasonable diligence beforehand; and (3) of the sort that would probably change the jury's verdict if a new trial were granted."). Alvarado II, slip op. at 9-10.

We did not agree that defendant's PCR petition, as to appellate counsel's performance, could be denied without an evidentiary hearing. We found the letter "could be read as an effort [by Torres] to assuage her conscience and excuse herself for having testified truthfully against Alvarado," but could "also be read as an apology and explanation for having testified untruthfully with respect to some or all of her testimony." Id. at 19. Because Alvarado easily met the first two Carter factors, and Torres's statements, interpreted most favorably to Alvarado, see State v. Preciose, 129 N.J. 451, 463 (1992), would make the letter "highly material, particularly with respect to whether Alvarado's conduct on the day of the underlying incident amounted to murder or one of the lesser

8

included offenses charged to the jury, which were aggravated manslaughter and reckless manslaughter," the very reason the trial judge admitted the evidence Torres offered at trial, we remanded for an evidentiary hearing, "to evaluate fully the letter from Torres, and to determine whether it would have warranted a new trial." Alvarado II, slip op. at 21-22.

In our third opinion issued in 2018, State v. Alvarado (Alvarado III), No. A-2213-16 (App. Div. May 25, 2018), we considered defendant's appeal of the denial of his PCR petition after the evidentiary hearing on remand we ordered in Alvarado II. For reasons still not clear to us, the only witness to testify at the hearing was defendant's appellate counsel. Torres was not called and did not testify. Id. at 2. Although the trial court concluded defendant had not established either prong of the Strickland standard, we found, based on the testimony of appellate counsel, that "her failure to have argued that defendant's motion for new trial based on newly discovered evidence should not have been denied without an evidentiary hearing fell 'outside the wide range of professionally competent assistance.'" Id. at 16 (quoting Strickland v. Washington, 466 U.S. 668, 690 (1984)). We were unable to determine, however, whether counsel's failure caused defendant any prejudice, because the trial court had never conducted an "evidentiary hearing to determine whether Torres's letter

would have been sufficient to change the jury's verdict that defendant was guilty of murder." Id. at 16. See State v. Nash, 212 N.J. 518, 547 (2013). Accordingly, we reversed the denial of defendant's petition and "again remand[ed] for an evidentiary hearing on that critical issue." Alvarado III, slip op. at 17.

The trial court in 2019 finally conducted the remand hearing we ordered in our 2012 opinion. The hearing was brief, and Torres was clearly an unwilling witness. She testified through an interpreter. She was emotional, and when several times offered a break, refused, saying she wanted "to finish with this," or "No, no, I want to end this. I want this to end. I want this to end and I don't want to come back again."

As the focus of the hearing was the contents of the letter Torres allegedly wrote defendant while he was awaiting sentence for the murder of Torres's son, we reprint the translation admitted at the hearing:

> Dear Mr. Alvarado,
>
> This letter is to tell you and hoping in God that you are in good health and stability. Well, I imagine you have to be surprised about my letter, "yes" Luis, I am Maria, I am writing you because I felt I had to do it before I get over this nightmare.
>
> I need to leave my resentment and my grudge behind, leave it here and not carry it with me when I come out. It has not been easy for me the loss of my son. Luis, I ask, what happened that day? everything was fine

between the two of us, nobody wants to tell me what really happened, I know you are a good man and specially a good father, I know you lost your mind perhaps for something I said against you, but I had no other alternative, I had to tell you that you were who did everything so I can come good out of this, this was the deal I had to do with the prosecutor, forgive me my love. I know you are suffering a lot in that place, I know you love your sons a lot, and that to me, hurts me. However, I always was very stern with the poor boy, that hurts me a lot, but I think you were guilty, because you always liked to leave me alone and you left with your friends and I came to think that you had someone else, that made me mad, very angry, Luis, you have no idea "yes" I punished that boy, but it was not to kill him, I knew he had several black and blue marks and that is why they put me in jail, because I had said I knew of the blows and the black and blue marks, and by not had called the police, I know, you did not know about it, but because of that the prosecutor asked me to give the last statement, so they can find you guilty, as I said, I had no other option, I had to do something to save myself, I did not want it, but if I did not do it, the prosecutor would not take the charges away from me, forgive me. Now, I know you are thinking in appealing your case, that means if you do it, perhaps I had to testify again and I will have to say same thing, because of the deal with the prosecutor. Luis, it was not easy for me to take the decision of writing you, but I feel that everything that is happening in someway is my fault, I know you were right in willing to go to trial and to know how everything happened and where all these blows came from, the broken rib that [he] had for several months.

I am begging you to forgive me and I forgive you and I tell you it will not be easy to forget you, because I love you very much even though I harmed you but I had no other alternative, I explained to you well, I will be

11

A-0409-19

coming out soon from here and you do not the time they will be giving you, it hurts me what is going on, specially regarding your sons, I am sorry for my handwriting, you know that I have been through. I was under treatment while I was here, in the Hudson County, I am going to give you an advice, I am telling you for your own good, when you go to prison take good care of yourself, trust in God, what else I can tell you, I wish you the best and forgive me because I have lied, I want to you to understand me better, nobody knows how is been in here, I did not want to harm you but if I did not do it, I would be like you, remember I love you and it when I come out, I am going to try to help you O.K.

I wish you can write down to me, to this address
875867C/506072 (BRAVO) (EAST WING 3 ROOM)
PO Box 4004
CLINTON N.J. 08809

I love you, M. Maria (MC)

Defense counsel began his questioning by trying to establish the timing of this letter. Torres was confused about dates and where she had lived when, noting, at one point, "It's 17 years ago."[1] Counsel showed Torres four letters she purportedly wrote to defendant, none of which she could identify, saying

---

[1] That statement appears to be off by at least a year or so. Torres's son was killed in early March 2003, when she was around twenty-two years old. Defendant was convicted of his murder in September 2004. The dates of the other letters were not mentioned in the record, but the envelope defendant contends contained the letter quoted in the text, which is undated, appears to be postmarked sometime in 2005. Defendant's new trial motion was heard in late October 2005, and he was sentenced on November 4, 2005.

she "just [didn't] remember." Torres eventually identified three of the letters as hers, but denied writing this letter, although she testified she remembered addressing the envelope. Torres claimed the letter "says the same thing as the others, but this is not my handwriting."[2] She claimed not to recall whether she dictated the letter to someone else to write.

Torres claimed she wrote to defendant because she wanted to ask "him what had happened to [her] son because nobody wanted to explain to [her] anything." Torres admitting saying defendant was a good man and a good father in other letters, but denied ever saying she was "that stern" with her son, explaining counsel should understand "that the words that are written in Spanish not necessarily mean exactly the same thing when it is written in English." Directed to the line stating, "forgive me my love," counsel asked whether Torres had ever asked defendant to forgive her. Torres responded she "was trying to be affectionate towards him to see if I would get him to tell me what he did to my son," although still denying she wrote the letter.

Torres also denied ever saying to defendant that she "punished the boy but it was not to kill him," insisting it was defendant who punished the child. She

---

[2]  Although entered into evidence at the hearing, the other letters were not included in the appendix.

admitted communicating to defendant that were he to appeal, she would have to testify against him again "because of the deal [she] made with the prosecutor." Asked what her deal was, she answered "to tell the truth." Asked to read again the line near the end of the letter asking defendant "to forgive me because I have lied," Torres replied: "And that I lied about what? Why don't you let me tell you what was my lie, because everything I said [in court] was the truth." Torres continued to assert that her testimony at trial had been truthful, and maintained, as she had already explained, that she "used to play with [defendant] with his mind to see he would be able to tell me what is it that he did to my son. It is the only thing that [I] wanted to do. Even to this day I don't know what he did to the child."

After counsel had completed their questioning, the court asked Torres whether she had testified truthfully at trial, and about the line in the letter saying, "I wish you the best and forgive me because I have lied," asking specifically, "Do you know what that means?" Torres responded that her trial testimony had been entirely truthful, including what defendant did to the child. Responding to the request for forgiveness, Torres explained she "told the truth there. If I had to say it again I will say again all the things that he used to do to the child. And that's it." Torres added it was "very painful to revive all of that again."

The PCR judge, who had not presided over the trial, found Torres's testimony credible. Although noting that Torres denied the handwriting was hers, and repeatedly said she didn't recall having anyone else write the letter or writing it herself, the judge found Torres at some point "acknowledged indirectly to having authored the letter." Relying on Torres's repeated assertions that she was "playing" with defendant's mind, however, the judge found Torres's testimony established "the letter was not meant to recant her trial testimony; it was a ploy meant to solicit information from petitioner regarding the baby."

"Based on Torres' numerous and unequivocal statements that she testified truthfully at [defendant's] trial, along with her explanations as to why she wrote a letter that appeared to contradict her trial testimony," the judge concluded defendant did not satisfy the third prong of the Carter test. Specifically, the judge wrote that "[t]he letter is not 'believable' and does not 'so seriously impugn[] the entire trial,'" quoting State v. Carter, 69 N.J. 420, 427 (1976). Because defendant could not show that "Torres'[s] letter 'would probably change the jury's verdict if a new trial were granted,'" Carter, 85 N.J. at 314, the judge found defendant was not entitled to a new trial and, thus, notwithstanding appellate counsel's deficient performance in failing to challenge the denial of

15

the motion for new trial on direct appeal, could not establish he was prejudiced thereby under the second prong of Strickland.

Defendant appeals, raising the following arguments:

THE PCR COURT ERRED IN DENYING DEFENDANT'S PETITION FOR POST-CONVICTION RELIEF BECAUSE APPELLATE COUNSEL WAS INEFFECTIVE IN FAILING TO APPEAL THE DENIAL OF MR. ALVARADO'S MOTION FOR A NEW TRIAL BASED ON THE EXCULPATORY EVIDENCE CONTAINED IN THE LETTER WRITTEN BY MS. TORRES, WHICH WARRANTS A NEW TRIAL.

In his pro se supplemental brief, defendant adds the following points:

POINT I

THE PCR COURT ERRED IN ITS EVIDENTIARY HEARING DENIAL, AS THE FINDING OF CREDIBILITY IS NOT SUPPORTED BY THE RECORD, BECAUSE THE WITNESS'S TESTIMONY SHOWS THAT SHE LIED UNDER OATH DURING THE HEARING, WHICH UNDERMINES THE TRUSTWORTHINESS OF HER TESTIMONY, WHICH WAS SOLELY USED IN SECURING APPELLANT'S CONVICTION. MOREOVER, THE PCR COURT ERRED WHEN IT MADE A DETERMINATION AS TO THE TRUTHFULNESS OF THE WITNESS, AS THIS DUTY IS TO BE LEFT TO A JURY.

A. Ms. Torres's testimony was untruthful, and therefore cannot be relied upon to support the PCR court's findings.

16

B. The PCR court erred when it made a credibility determination of the witness's trial testimony, as such determination is only to be made by a jury.

POINT II

THE PCR COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE WHEN HE FAILED TO FILE APPELLANT'S PRO SE LETTER BRIEF WHICH VIOLATED APPELLANT'S RIGHT TO DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONST. AND ART. 1 PAR. 10 OF THE NEW JERSEY CONSTITUTION.

As we determined in Alvarado III that defendant established the first prong of Strickland based on the failure of his appellate counsel to argue the trial court should not have denied his new trial motion without an evidentiary hearing, our only task here is to determine if the remand court was correct that defendant suffered no prejudice from that failure because Torres's letter does not entitle defendant to a new trial. See Strickland, 466 U.S. at 694-95 (stating grant of new trial because of ineffective assistance of counsel depends on whether result would have been different but for counsel's deficiency); State v. Bray, 356 N.J. Super. 485, 499 (App. Div. 2003) (explaining PCR court must determine the merits of the claim omitted on direct appeal in order to assess whether deficient performance of appellate counsel would or would not have prejudiced the defense).

As our Supreme Court regularly reminds, "[o]ur rules governing post-conviction relief are the last line of defense against a miscarriage of justice." Nash, 212 N.J. at 526. "[T]he purpose of post-conviction review in light of newly discovered evidence is to provide a safeguard in the system for those who are unjustly convicted of a crime." State v. Ways, 180 N.J. 171, 188 (2004). Nevertheless, because, "[a] jury verdict rendered after a fair trial should not be disturbed except for the clearest of reasons," our courts review a claim alleging newly discovered evidence "with a certain degree of circumspection to ensure that it is not the product of fabrication, and, if credible and material, is of sufficient weight that it would probably alter the outcome of the verdict in a new trial." Id. at 187-88.

"[R]ecantation testimony, a species of newly discovered evidence generally regarded 'as suspect and untrustworthy,' is subject to especially close scrutiny." Id. at 196-97 (quoting Carter, 69 N.J. at 427). "Consequently, the burden of proof rests on those presenting such testimony to establish that it is probably true and the trial testimony probably false." Carter, 69 N.J. at 427. The Court has explained the test for the trial judge

> in evaluating a recantation upon a motion for a new trial is whether it casts serious doubt upon the truth of the testimony given at the trial and whether if believable, the factual recital of the recantation so seriously

> impugns the entire trial evidence as to give rise to the conclusion that there resulted a possible miscarriage of justice. His [or her] first duty is, therefore, to determine whether the recanting statement is believable.
>
> [Ibid. (quoting State v. Puchalski, 45 N.J. 97, 107-108 (1965)).]

Our job as a reviewing court is to "engage in a thorough, fact-sensitive analysis to determine whether the newly discovered evidence would probably make a difference to the jury." Ways, 180 N.J. at 191. As the Court instructed in Carter, however, "[t]he determination of the credibility or lack thereof of recantation testimony is peculiarly the function of the trial judge who sees the witnesses, hears their testimony and has the feel of the case." 69 N.J. at 427. Critically important, a witness's "[m]anner of expression, sincerity, candor and straightforwardness are just some of the intangibles available to the trial judge in evaluating the credibility of recantation testimony." Id. at 427-28. Because a reviewing court lacks that "advantage, [it] should ordinarily defer to the trial judge's findings on this sensitive issue as long as the proper criteria are used." Ibid.; see also Ways, 180 N.J. at 196-97 (noting "deference is particularly warranted in the context of recantation testimony").

This, of course, is not classic recantation testimony. The alleged recanting witness, Torres, insists her testimony at trial was truthful and the letter, an effort

to cajole defendant into telling her what he had done to her son, was not. Importantly, not one, but two trial judges, having heard Torres testify — the trial judge at the N.J.R.E. 104 hearing and at trial, and the PCR judge at the remand hearing following Alvarado III — have found her to be a credible witness.[3]

While defendant's counsel insists that Torres's explanation for the letter was not believable, and defendant, even more blunt, claims Torres "lied multiple times" during her testimony, we are not so free to discount that the PCR judge believed what she had to say about the letter and the truthfulness of her trial testimony. See Ways, 180 N.J. at 196-97; Carter, 69 N.J. at 427. We are also keenly aware of the dangers of substituting our view of a witness's credibility for the trial judge's based on our reading of a cold record. See Nash, 212 N.J.

---

[3] In denying defendant's new trial motion, the trial judge noted defense counsel's vigorous cross-examination of Torres and her demeanor at trial, stating:

> She was understandably shaken at the trial. She's talking about her seventeen-month-old son, no matter who was at fault, and even if nobody was at fault, he's dead. So, clearly, she's upset. She's talking about the person she apparently at least at one time loved, and apparently she's telling us [in the letter] still does love him sitting about twenty feet away from her. She's testifying against him.

And notwithstanding that, the judge stated he "found her testimony extremely credible and straightforward at the trial."

at 540 ("An appellate court's reading of a cold record is a pale substitute for a trial judge's assessment of the credibility of a witness he has observed firsthand."). As Judge Jayne observed, "the best and most accurate record (of oral testimony) is like a dehydrated peach; it has neither the substance nor the flavor" of the real thing. Trusky v. Ford Motor Co., 19 N.J. Super. 100, 104 (App. Div. 1952).

That substance and flavor is especially critical here, as we have already acknowledged Torres's letter could be read two ways — "as an effort to assuage her conscience and excuse herself for having testified truthfully against Alvarado," or "as an apology and explanation for having testified untruthfully with respect to some or all of her testimony." Alvarado II, slip op. at 19. The PCR judge concluded the letter was not an apology for Torres having testified untruthfully against defendant at trial. And the judge believed Torres when she said her trial testimony had been true, and she had not lied about anything, including the injuries defendant had inflicted on her son in the months before his death. We defer to those findings, which were based on the judge's first-hand observation of the witness and her answers to his and the parties' questions. See Nash, 212 N.J. at 540-41.

A-0409-19

Although we defer to the judge's credibility findings, we are also mindful that had the letter been written before or during trial, the State would have had no basis to object to its use by the defense to impeach Torres's testimony. See Strickler v. Greene, 527 U.S. 263, 280 (1999); State v. Nelson, 155 N.J. 487, 497-98 (1998). Accordingly, we have reviewed the trial record to consider whether Torres's letter, had it been admitted, "would probably make a difference to the jury." Ways, 180 N.J. at 191.

Defendant conceded in his statement to the police that he caused the baby's death. Defendant told police that Torres went out to the store in the morning to get milk for the baby. When the child saw her put on her coat and get ready to leave, he'd started to cry. The baby took a bottle but later began to cry again. Defendant said he was watching Italian league soccer on television, and he pressed the baby to his chest to quiet the child's crying. Defendant said the baby quieted down "after that," and he laid the child on his bed and went back to watch the game. Defendant then heard the baby gasping for air, "like . . . he can't breathe." Defendant called Torres to come home, which she immediately did, but the baby was unresponsive by the time she arrived.

Asked at the end of his statement if there was anything else he wanted to say, defendant added this:

What I can say?  So, you know, if something happen with the baby, I thinks, I'm responsible because, you know, if, maybe if I don't press him like that[,] the baby didn't go and die.

Q:  Okay.

A:  So, I feel, I feel so bad because you know, I didn't want to kill him.  Definitely I didn't wanna kill him. But you know.  We never know when this stuff's gonna happen you know.  Um, I did this before with him.  And, you know, his reaction was normal you know.  And I think this time it, it's gonna be the same thing.  But you know, it's, it's not a, it's not a same thing. So, I don't know.  That's all I have to say.

The State's forensic pediatric pathologist testified to evidence discovered during the postmortem exam that defendant had indeed done "this before with" the child.  Specifically, the pathologist found a healing rib fracture inflicted, in his opinion, from ten to fourteen days and up to a month before the child's death. The pathologist also testified the child, who was about thirty-one inches tall and weighed twenty-two pounds, suffered three distinct injuries at the time of his death that could not have been inflicted simultaneously.  There was a line of small reddish bruises along the child's backbone, which to the pathologist resembled multiple fingerprints, "certainly compatible with the tip ends of fingers pressing against the skin," as well as larger bruises on the lower left and right front of the child's chest, "almost like a palm in the front and fingers along

23

. . . the back."  The child also suffered from bruises and abrasions along his jaw line, a scrape around his mouth and a torn upper frenula, consistent with "something, force pushing up on the jaw, pushing the upper lip . . . and essentially pushing upward to tear the frenula."  Finally, the child suffered a deep muscle injury to his left thigh.

The pathologist testified that when "multiple ribs crack, you can hear them and you feel [the chest] becomes lax."  The doctor illustrated his point with an analogy, "you know when you break a stick, you hear it crack and it just bends, it collapses.  You know it when you're doing it."  The doctor further explained that "you can't squeeze the chest, push up on the face and cause an injury to the left thigh" simultaneously.  The doctor opined those injuries would have had to occur at different times.  And although the interval between each may have been brief, as all occurred shortly before death, he testified that "regardless of the time frame between them . . . that would be repetitive and it would also have to be intentional.  These [injuries] don't happen on their own."

That testimony was devastating to the defense in two respects.  It corroborated defendant's statement to the police that he had done "this before with" the child and undercut his contention that he had not acted intentionally in causing the child's death.

A-0409-19

Defendant's counsel had opened to the jury conceding defendant had caused the child's death, but asserted he had done so recklessly, making him guilty of manslaughter but not murder. In his summation, defense counsel again conceded the child's death was not an accident. He argued of the three versions jurors had heard as to how it happened — the one where defendant was playfully tossing the child in the air and unable to catch him, the statement he gave to police that "something happened and it's my responsibility," and the version offered by defendant's fellow inmate at the jail — the "real version," the "true version" was the last, that defendant had gotten frustrated with the baby when he wouldn't stop crying during the game, slammed him into the wall and threw him towards the bed where he hit the bedpost and slid to the floor.

That version was the only one that could account for all three injuries the pathologist claimed the child suffered at the time of his death that might be consistent with reckless, and not intentional conduct. Counsel argued the "whole set of injuries that happen[ed]" as a result of defendant slamming the child into the wall made that version the most consistent with the doctor's testimony. He also argued that defendant's two outbursts during the trial, both before the jury, the first when he complained the prosecutor was not letting defense counsel ask questions and the second when he stood up and pointed

A-0409-19

toward his fellow inmate at the end of his testimony and said — in English: "I'm going to make sure people in jail know you're a f…ing snitch," demonstrated defendant was concededly "a little hotheaded."[4] Counsel contended those two "little snapshot[s]" revealed defendant "can't control himself. Temper problem, anger problem." He argued that, as with striking the child, defendant didn't appreciate the risk of such reckless outbursts, making clear defendant was "impulsive" and "probably a poor thinker."[5]

Defense counsel argued the only two important witnesses had been the jail house informant and the medical examiner. He dismissed Torres, saying "[s]ome people think she's sad and pathetic and you feel sorry for her, and other

---

[4] Defendant employed a Spanish interpreter throughout the trial and all court proceedings.

[5] Defense counsel moved for a mistrial immediately after defendant's second outburst, the threat against the jail house informant, arguing it compromised the defense and "poisoned" his efforts going forward. The prosecutor urged the judge to consider that defendant "seeing his defense . . . has been destroyed, to put it mildly, by both [a] forensic pathologist[] and by direct witnesses[,] may have decided that his only alternative to a conviction is to have an outburst." The judge denied the motion, in part because defendant's outburst wasn't inconsistent with the defense defendant was mounting — "He gets frustrated and upset. When things don't go his way, he gets upset and he has an outburst." Defense counsel stated that, although it wouldn't be his preference, he would "be summing up to that" if his mistrial motion was denied. We note defendant's outburst, and the prosecutor's assessment of the State's case to that point, occurred before Torres testified.

people are going to say you're just as culpable, how dare you." He argued that assuming everything she said was true, it didn't make defendant a murderer. Counsel highlighted Torres's testimony claiming defendant admitted he put hot sauce on the baby's bottle as a practical joke, and promised he wouldn't do it again when she didn't find it funny, as "not the mindset of somebody who wanted to kill the kid."

Although we have no doubt Torres's testimony was harmful to defendant, having reviewed the entire trial record, even more damning than Torres's accusations was defendant's own unstudied admission, corroborated by the medical examiner, that defendant had done "this before with" the child. Moreover, defendant's explanation of why he employed the same "pressing" technique on the day of the baby's death — that "[the baby's] reaction was normal," the first time, leading defendant to think "it's gonna be the same thing" this time, reflected intent not impulsiveness.

Accordingly, we affirm the PCR court's determination, made after hearing Torres testify, that the 2005 letter does not cast serious doubt on the testimony she gave at defendant's trial, and conclude that even were Torres's letter before the jury, it did not have the power to likely alter the verdict in light of the State's other evidence against defendant, none of which relied on Torres's testimony in

27

any particular. Even were the jury to believe Torres lied about defendant's prior acts against the child, defendant's admission he "pressed" the child on a prior occasion, corroborated by the pathologist's discovery of a healing rib fracture, and defendant's concession that his doing so again caused the child's death, make it unlikely anything Torres had to say would have changed the jury's verdict, even from murder to manslaughter.

We thus affirm the denial of defendant's first petition for PCR on the basis that defendant failed to establish he suffered any prejudice from appellate counsel's failure to argue defendant's motion for a new trial, based on Torres's letter, should not have been denied without an evidentiary hearing. We find defendant's arguments to the contrary, including those made in his pro se brief, to be without merit.[6] See R. 2:11-3(e)(2).

---

[6] We include in that the argument presented in Point II of defendant's pro se brief that PCR counsel was ineffective for having failed to file defendant's "pro se letter brief" with the trial court in advance of the evidentiary hearing we ordered in Alvarado III. In that brief, included in defendant's pro se appendix, defendant argued: "The court should grant defendant's PCR and order a new trial even if Ms. Torres fails to appear for the evidentiary hearing because the trial court, as well as the appellate courts have doubts concerning her credibility." As Torres appeared at the hearing and testified, PCR counsel's alleged failure to have filed defendant's pro se brief with the PCR court could not have resulted in any prejudice to him. See Strickland, 466 U.S. at 694.

We turn next to defendant's appeal in A-2252-19 from the denial of his second PCR petition without an evidentiary hearing based on the United States Supreme Court's decision in McCoy v. Louisiana, 138 S. Ct. 1500 (2018). The Court in McCoy held that when a defendant expressly asserts he wishes to maintain his innocence and does not want to admit guilt, "his lawyer must abide by that objective and may not override it by conceding guilt," notwithstanding the lawyer's belief that conceding guilt would be the only hope of assisting the defendant's case. Id. at 1509.

Following the Court's decision in McCoy, defendant attempted in January 2019 to file a timely second petition for PCR, alleging his trial counsel violated his Sixth Amendment-secured autonomy by conceding defendant recklessly caused the victim's death over defendant's objection. The criminal division, however, refused to file the petition, advising defendant he could not proceed with his second PCR while his first remained pending. Defendant wrote to the division advising he was aware his first petition remained pending but was attempting to insure he could avail himself of the newly recognized right in McCoy by filing a new petition within a year of that opinion, which was issued May 14, 2018, in accordance with Rule 3:22-12(a)(2)(A).

Following the trial court's denial of defendant's first petition in June 2019, defendant re-filed his second PCR petition based on McCoy. The court denied both the petition and defendant's subsequent motion for reconsideration. While acknowledging that defendant's second petition was timely filed in accordance with Rule 3:22-12(a)(2)(A), the court nevertheless denied it on the basis of Rule 3:22-4, reasoning that defendant could have brought his new claim during the "prior proceedings" on his first PCR petition.

Defendant appeals, arguing:

> THE LOWER COURT ERRED IN DENYING APPELLANT'S PCR PETITION, WHEN IT DID NOT CONDUCT AN EVIDENTIARY HEARING TO ASCERTAIN IF APPELLANT'S SIXTH AMENDMENT RIGHT TO AUTONOMY IN HIS OWN DEFENSE WAS VIOLATED, PURSUANT TO MCCOY V. LOUISIANA, 584 U.S. (2018), WHEN TRIAL COUNSEL TOLD THE JURY THAT APPELLANT WAS GUILTY, DESPITE HIS ADAMANT DENIALS OF GUILT.

We affirm the denial of defendant's petition, although for reasons different from those expressed by the trial court. See Hayes v. Delamotte, 231 N.J. 373, 387 (2018) (directing that a "trial court judgment that reaches the proper conclusion must be affirmed even if it is based on the wrong reasoning").

Rule 3:22-12(a)(2)(A) provides that

> Notwithstanding any other provision in this rule, no second or subsequent petition shall be filed more than one year after the latest of:
>
> (A) the date on which the constitutional right asserted was initially recognized by the United States Supreme Court or the Supreme Court of New Jersey, if that right has been newly recognized by either of those Courts <u>and made retroactive by either of those Courts to cases on collateral review</u>.
>
> [Emphasis added.]

We agree with defendant that <u>McCoy</u> announced a newly recognized constitutional right. Defendant does not, however, address whether the Court in <u>McCoy</u> made that right "retroactive . . . to cases on collateral review" as the Rule requires, that is applicable to those cases before the court on PCR "where all avenues of direct appeal have been exhausted." <u>See</u> <u>State v. J.A.</u>, 398 N.J. Super. 511, 514 (App. Div. 2008). Unless <u>McCoy</u> applies retroactively to cases on collateral review, it is of no avail to defendant here.[7]

Although Justice Ginsberg made clear in <u>McCoy</u> that counsel conceding a client's guilt over the client's express objection is structural error, meaning a defendant need not show prejudice in order to be entitled to a new trial, 138 S.

---

[7] Although our Supreme Court could determine to apply the rule of <u>McCoy</u> retroactively as a matter of state law in New Jersey PCR proceedings, <u>see</u> <u>Danforth v. Minnesota</u>, 552 U.S. 264, 282 (2008), until it does, we are bound by the strictures of <u>Rule</u> 3:22-12(a)(2)(A).

Ct. at 1511, the decision is silent as to whether it is to be applied retroactively to cases on collateral review.  Two circuit courts considering the issue, however, have ruled McCoy does not apply retroactively to collateral challenges of final convictions.  See Smith v. Stein, 982 F.3d 229, 233-35 (4th Cir. 2020); Christian v. Thomas, 982 F.3d 1215, 1224-25 (9th Cir. 2020).

Those courts reason the Supreme Court has held that new rules of constitutional law, such as the one announced in McCoy, are "generally applicable only to cases that are still on direct review."  Smith, 982 F.3d at 233 (quoting Whorton v. Bockting, 549 U.S. 406, 416 (2007)).  The only exception for procedural rules such as this one has been if the rule is truly a "'watershed rul[e] of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding."  Whorton, 549 U.S. at 416.  The Fourth Circuit, however, noted "the Supreme Court has never found a new procedural rule to be 'watershed' even though it has considered the question more than a dozen times."  Smith, 982 F.3d at 235 (citing Whorton, 549 U.S. at 418 (collecting cases)).

More recently, the Supreme Court itself noted that in the thirty-two years since it announced the exception for watershed rules of criminal procedure in Teague v. Lane, 489 U.S. 288, 311 (1989), "the Court has never found that any new procedural rule actually satisfies that purported exception."  Edwards v.

Vannoy, 141 S. Ct. 1547, 1555 (2021). The Edwards Court declared that "[c]ontinuing to articulate a theoretical exception that never actually applies in practice offers false hope to defendants, distorts the law, misleads judges, and wastes the resources of defense counsel, prosecutors, and courts." Id. at 1560. It accordingly announced "[t]he watershed exception is moribund," and abandoned it. Ibid. The law is now that "new procedural rules apply to cases pending in trial courts and on direct review. . . . [b]ut . . . do not apply retroactively on federal collateral review." Id. at 1562.

Given the Court's announcement in Edwards that no new procedural rule will apply retroactively in federal habeas proceedings, we are confident the new rule announced in McCoy does not apply here as a matter of federal law, and thus, that defendant's second PCR petition is barred by Rule 3:22-12(a)(2)(A). Our disposition makes it unnecessary to resolve our doubts that Rule 3:22-4(b)(2)(A) was properly invoked by the trial court in light of the terms of our limited remand in Alvarado III.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0409-19