STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. SYLVESTER JOHNSON, STANLEY CASSIDY AND WAYNE GODFREY, DEFENDANTS-APPELLANTS.

Argued December 5, 1960—Decided February 6, 1961.

*Mr. Stanford Shmukler* argued the cause for the defendants-appellants (*Mr. Edward Kent,* attorney; *Mr. Stanford Shmukler* and *Mr. Curtis R. Reitz,* of the Pennsylvania Bar, of counsel).

*Mr. Norman Heine,* Camden County Prosecutor, argued the cause for the plaintiff-respondent.

The opinion of the court was delivered by

PROCTOR, J. The defendants, Sylvester Johnson, Stanley Cassidy, and Wayne Godfrey, were convicted of murder in the first degree without recommendation and sentenced to death. This court affirmed the convictions. *State v. Johnson,* 31 *N. J.* 489 (1960). Shortly before their scheduled execution the defendants obtained new counsel and, through

him, moved for a new trial upon the basis of alleged newly discovered evidence. The trial court denied the motion and the defendants appealed to this court. Granting a stay of execution, we ordered the trial court to take testimony on the motion. Pursuant to our order, the trial court conducted a hearing and again denied defendants' motion. Defendants now appeal from the trial court's order denying their motion for a new trial.

Defendants argue that the trial court erroneously denied their motion, and that they are entitled to a new trial on four grounds: (1) that on the *voir dire* a member of the jury panel failed to disclose background information which would have led to her disqualification; (2) that they were convicted through the use of involuntary and untrue confessions, and the suppression by the State of evidence favorable to their defense; (3) that *N. J. S.* 2A:113–4, which permits a jury to recommend life imprisonment in first degree murder cases, contains no standards to guide the jury and is therefore unconstitutional; and (4) that under our decision in *State v. Mount*, 30 *N. J.* 195 (1959), published after their trial, they are entitled to introduce background evidence to assist the jury in determining whether to recommend life imprisonment.

## I.

The State contended defendants were guilty of felony murder, *i. e.,* that they killed one Edward J. Davis while attempting to rob him. Defense counsel were therefore understandably anxious to exclude from the jury persons who had been the victims of robbery or who were intimately acquainted with victims of robbery. Accordingly on the *voir dire* one Grace M. Wheeler was asked the following question: "Have you ever been the victim of a robbery or has any of your friends or relatives ever been the victim of a robbery?" She answered, "No, I have not. No one that I know of." Mrs. Wheeler was then seated as one

of fourteen on the jury.[1] She sat as a juror during the trial, but was excused for illness before its conclusion and did not participate in the jury's deliberations.

At the hearing below, Mrs. Wheeler testified that six months after the conviction of the defendants she recalled that her husband had been the victim of three armed robberies about eighteen or nineteen years before she was summoned for jury duty. She further testified that at the time of the trial she had forgotten these incidents and believed her answers on the *voir dire* to be true. Defendants argue that because Mrs. Wheeler's husband had been the victim of armed robberies she probably harbored a latent or unconscious bias against persons accused of robbery; that she probably communicated this bias to other jurors; and that the defendants were thus prejudiced by being deprived of a fair and impartial jury. In support of their argument they cite *United States ex rel. DeVita v. McCorkle,* 248 *F.* 2d 1 (3 *Cir.*), *certiorari* denied 355 *U. S.* 873, 78 *S. Ct.* 121, 2 *L. Ed.* 2d 77 (1957).

█ The trial judge at the hearing on defendants' motion ruled that *DeVita* was distinguishable. We agree. *DeVita* was also a felony-murder prosecution. On the *voir dire,* defense counsel inquired whether prospective jurors had been robbery victims. After the defendant's trial and conviction of first degree murder without recommendation, it was discovered that Arthur Kuhnle, one of the jurors who had decided DeVita's fate, failed to disclose on the *voir dire* that he had been a victim of armed robbery seven months before the crime with which DeVita was charged. The Federal Court of Appeals for the Third Circuit, presuming that Kuhnle because of his experience was biased against accused robbers, held that his presence on the jury, whose

---

[1] Where it is likely that a trial may be protracted, the court in its discretion may direct the impanelling of one or two extra jurors. If at the conclusion of the court's charge more than 12 remain, 12 are selected to constitute the body which determines the issues. *N. J. S.* 2A :74–2.

sole function in the circumstances of the case was to determine punishment as between life and death, deprived defendant of a fair trial in violation of the Fourteenth Amendment. If, as the Third Circuit presumed, Kuhnle was biased against persons who allegedly committed armed robbery, his participation in the jury deliberations in such a situation which resulted in a sentence of death was prejudicial to DeVita. The facts of the present case, however, rebut any presumption of prejudice to defendants. Mrs. Wheeler was not on the jury which found the defendants guilty. She was excused before the jury retired to deliberate. Any prejudice to the defendants must arise, therefore, from her influence upon other jurors prior to the time when she was excused. But at the hearing below she and another juror, Mrs. Alice Conroy, testified that members of the jury, following the trial court's instructions, did not discuss the case during the course of the trial, and that Mrs. Wheeler did not discuss her husband's experiences. Additionally, we note that three other members of the jury were subpoenaed by the defendants, were present at the hearing, but were not called to testify. We think it fair to assume that if these jurors would have testified that any matters pertaining to the case were discussed prior to their deliberations, they would have been called by defense counsel. Accordingly, we hold that although Mrs. Wheeler's husband had been a robbery victim, since she did not participate in the jury's deliberations and did not discuss the case or her husband's experiences with any of the jurors, her presence on the jury during the trial was not prejudicial to the defendants and did not deprive them of a fair and impartial jury.

## II.

Defendants next urge that they are entitled to a new trial because they were convicted in violation of the Fourteenth Amendment through the use of confessions which were involuntary and untrue. Their related and subsidiary argu-

ment is that the State, in the taking of the confessions, suppressed evidence favorable to the defense.

An outline of the evidence introduced at the trial which resulted in defendants' convictions is essential to an understanding and evaluation of their argument: On January 24, 1958, Edward J. Davis was fatally shot at his toy store in Camden. As a result of a clue furnished by a witness who observed an automobile going through a red traffic light, which automobile was registered in Godfrey's name, the three defendants were apprehended. All of the defendants confessed that they attempted to rob Davis in his toy store and that during the attempt Johnson shot him. The content of their confessions was substantially as follows: On the afternoon of the killing, they met at Cassidy's home where they planned the robbery. Godfrey drove Cassidy and Johnson to the vicinity of the toy store. While Godfrey remained in the parked car, Cassidy and Johnson, each carrying a gun, entered the store. During the course of the attempted holdup, Johnson shot Davis. Cassidy and Johnson then rejoined Godfrey in his car and the three fled the scene. The details of the confessions together with corroborative evidence introduced at the trial are fully set forth in our opinion on defendants' appeal to this court in *State v. Johnson, supra,* 31 *N. J.,* at *pp.* 494 to 504.

At the hearing on their motion for a new trial, all of the defendants testified that they were beaten by the police; that at the time of their interrogations they were under the influence of narcotics; that they were deprived of sleep and food; and that they were continuously questioned by the police who "fed" them the story which ultimately appeared in their confessions. The defendants also testified to what they now claim is the true version of the homicide. They said that the purpose of the visit to Davis' store was not to commit robbery but to collect a debt. Johnson testified to the following: He had purchased narcotics from one Noah Hamilton. Three months before the homicide, Hamilton suggested that Johnson deliver narcotics for Ham-

ilton and Davis, and took Johnson to Davis' store where it was arranged that Johnson would make deliveries and be paid by Hamilton. Thereafter, he made deliveries, and on each occasion was paid by Hamilton. He was given narcotics by Hamilton for delivery and had no further contact with Davis. On the day of the homicide Johnson visited Hamilton to collect $15 for a delivery made the day before. Hamilton told him to collect from Davis. After leaving Hamilton, Johnson returned home where he smoked three reefers and took nembutal pills, all given to him by Hamilton. He then went to Cassidy's house because he wanted company when he went to collect the debt from Davis. When he arrived at Cassidy's, Godfrey was pulling up in his automobile. Johnson and Cassidy got into the automobile with Godfrey, and that is the last Johnson remembered. The next thing he remembered, it was the following morning and he was in his sister's home with a hangover.

Godfrey and Cassidy testified at the hearing below similarly to Johnson. Both said the purpose of the visit to the toy store was to collect a debt owed by Davis to Johnson; that they did not know Davis and that they had never been in his store. Cassidy testified to the following: When he and Johnson entered the Davis store, Cassidy was not carrying a gun. Cassidy looked over the toys while Johnson and Davis talked. Davis ordered Johnson out of the store. Cassidy and Johnson left but when they were outside Johnson announced he was returning. They went back in the store. Davis swore at Johnson. The two struggled and the gun in Johnson's possession went off. Both Godfrey and Cassidy testified that the day after the homicide they told Johnson, who did not remember the killing, what had happened in the store.

All three defendants testified that at the time of the shooting they were under the influence of narcotics. They said they informed the police that they were using narcotics, that Davis was a seller, and that the purpose of their visit to

the toy store was to collect for a narcotics delivery. They said the police ignored this information and "fed" them the story of attempted robbery.

Johnson also testified that he informed his attorney at the trial that at the time of the homicide he was under the influence of narcotics and that he went to Davis' store to collect a debt for delivering narcotics. Cassidy said he told his attorney he was a narcotics user. Godfrey did not. All defendants testified that they told their attorneys they wanted to take the stand at their trial, but were not called. Defendants do not here allege that their trial attorneys were incompetent. Instead, they claim that there was a failure of effective communication between attorneys and clients so that the involuntary nature of the confessions, the use of narcotics, and the purpose of the visit to Davis' store were not brought out at the trial. These omissions, they say, deprived them of an opportunity for a fair adjudication of their guilt.

At the hearing on their motion for a new trial, defendants offered the testimony of various witnesses as corroborative of their testimony. Barbara Molock, girl friend of Cassidy, said that on the day of the homicide she was with Cassidy when Johnson arrived at the latter's house, and that Johnson appeared "sleepy" and unresponsive. Geraldine Hatcher, sister of Johnson, testified that Johnson was at her home following the homicide and that he appeared to be confused and "was not his normal self." Allain Johnson, mother of defendant Johnson, testified that when she saw her son after he was arrested in Newark and brought to Camden, his lips and mouth were swollen. She also said that she had asked her son's attorney to allow her to testify on his behalf at the trial, but the attorney refused. She also told her son's attorney that her son wanted to take the stand. Robert A. Jones, an inmate of the New Jersey State Prison, testified that while he was confined in the county jail Cassidy told him he was an addict and Davis was a dealer in drugs. Jones also said Cassidy told him that he owed Davis money

for drugs and Davis would not give him any more until he paid his debt. Arthur Cole, another prisoner, testified that he delivered packages about the size of a cigarette pack for Davis. Ernest Rodgers, a former convict, testified that friends of his who had no narcotics when they entered Davis' store had them when they left. The testimony of Noah Hamilton we shall discuss below.

As mentioned above, defendants' motion for a new trial is based upon alleged newly discovered evidence. Such a motion is addressed to the sound discretion of the trial court. *State v. Bunk,* 4 *N. J.* 482, 485 (1950). To qualify as newly discovered in the legal sense, evidence must be (1) material to the issue and not merely cumulative or impeaching or contradictory; (2) discovered since the original trial and not discoverable by the use of reasonable diligence prior thereto; and (3) of the sort which would probably change the jury's verdict if a new trial were granted. *State v. Smith,* 29 *N. J.* 561, 573 (1959); *State v. Richter,* 21 *N. J.* 421, 424 (1956). The same judge who presided at defendants' trial heard the testimony on defendants' motion for a new trial. At the hearing below, he ruled that the proffered evidence relative to the coerced nature of defendants' confessions and the circumstances of the homicide was not newly discovered because (1) it was discoverable prior to the original trial, and (2) it was unworthy of belief. After a careful review of the record of the original trial and the hearing below we are satisfied that the judge properly exercised his discretion.

The first ground of the trial court's denial—*i. e.,* that the proffered evidence was discoverable prior to the original trial—is clearly supported by the record. If the defendants' testimony on the hearing below is true, they knew prior to their original trial that their confessions were involuntary and that they never intended to rob Davis. The proffered evidence thus was not newly discovered at all. *State v. Vaszorich,* 13 *N. J.* 99, 131 (1953). Indeed, trial counsel for defendants attempted to bring some of it out

at the examination into the voluntariness of the confessions. Chief Detective Dube, who directed the interrogations, was asked if he had any evidence that Johnson used narcotics. He said no. Defense counsel also inquired as to the physical condition of defendants and the method of interrogation. The decision not to put the defendants on the stand either at the examination into the admissibility of the confessions or after the State rested its case was a decision of trial tactics which not even the wisdom of hindsight can label as injudicious. Johnson and Godfrey had prior criminal convictions which defense counsel might reasonably have concluded would adversely affect the jury in its assessment of appropriate punishment. The same holds true for evidence of the use of narcotics. Additionally, we note that defendants evidently acceded to the decision not to put them on the stand. During the trial of the State's case, all three defense counsel discussed, in the presence of defendants, the advisability of having defendants testify and concluded it would be unwise, and Johnson's counsel had him sign a statement acknowledging that he was not to take the stand.

█ Failure of a defendant to satisfy any one of the three prerequisites of newly discovered evidence is sufficient to warrant a denial of a motion for a new trial. See *State v. Bunk, supra.* It would therefore be unnecessary in ordinary circumstances for us to consider whether the court's further finding that the proffered evidence is unbelievable is substantiated by the record. But because defendants argue that there has been a violation of the Fourteenth Amendment, we have examined the record with care and have concluded that the proffered evidence was untrue and that there is no reasonable basis to say that the confessions were involuntary or that the State suppressed any evidence.

█ If, as defendants now allege, their confessions were obtained through intimidation and physical violence, it seems to us that they would have produced some evidence to that effect at the original trial. Not only did they fail to do so, but the evidence overwhelmingly demonstrated that the con-

fessions were voluntarily given. Before the confessions were admitted in evidence, the trial judge excused the jury and conducted a preliminary examination into their voluntariness. All of the officers who were present at the interrogations were put on the stand by the State and cross-examined by the three defense counsel. Defense counsel probed at length into the method of interrogation, the condition of defendants, and their treatment during and prior to the transcribing of their statements. These questions failed to elicit any evidence tending to show that the confessions were involuntary. Instead, the evidence showed that defendants were carefully informed of their rights, were considerately treated, and were asked questions to which they often gave long, narrative responses. Additionally, we note that the confessions were given in the presence of and transcribed verbatim by an official court stenographer who corroborated the testimony of police officers that defendants were not intimidated or mistreated in any manner. After the examination of State witnesses who were present at each interrogation, the court asked each defendant if he had any testimony or evidence which he desired to offer as to the involuntary nature of his confession. Each defendant consulted with his counsel, then declined to take the stand or to offer any evidence on his behalf. At the close of the examination, the trial court ruled that the confessions were voluntary and they were read to the jury. On the appeal following defendants' convictions, they did not dispute the trial court's finding of voluntariness. Our examination of the record of the original trial and the proofs below convinces us that the defendants have wholly failed to sustain their contention that their confessions were involuntary.

Similarly, the defendants have failed to show that the version of the homicide contained in their confessions was untrue. At the trial, the confessions were corroborated in significant parts by the testimony of one Noah Hamilton. He testified that he met Godfrey on the evening of the homicide and at the latter's request bought a newspaper.

Godfrey asked him to look in the paper for news of a holdup and a shooting. Hamilton testified as follows:

"A. I told him there was no holdup in the papers with a shooting. The only holdup was with a shotgun.

Q. What did he say, if anything, to that remark by you? A. He said that was not him.

Q. Did he say anything else? A. He asked me where was it at.

Q. What did you tell him? A. On Broadway.

Q. Whereabouts on Broadway? A. Broadway and Ferry Avenue.

Q. What did he say to that? A. He said that was it."

Godfrey told Hamilton that he had been in the holdup but had not done the shooting. Hamilton also testified that on the following afternoon he drove with Godfrey, Cassidy and Johnson to Newark; that they stopped at Godfrey's aunt's house; and that Johnson was taken to his uncle's house and left there. Hamilton noticed a bandage on Johnson's finger, and asked him what happened. Johnson said he did not want to talk about it, but later told Hamilton that he hurt his finger "tussling" with the proprietor in the toy store. Finally, Hamilton testified that six or eight weeks before the holdup, Godfrey asked him to help rob a toy store on Broadway and "make some money." Hamilton refused.

This court ordered a hearing on defendants' motion for a new trial in part because of present defense counsel's assertion that Hamilton's testimony at the trial was false and that he wanted to retract it. At the hearing below, Hamilton, called to the stand by the defendants, not only failed to retract his prior testimony, but contradicted important elements in defendants' new version of the homicide. Hamilton admitted that he was a marijuana dealer, and that he had sold narcotics on various occasions to the three defendants. He denied, however, that he was connected with Davis in the sale of narcotics or that he arranged with Davis to have Johnson make deliveries. In fact, he stated that he did not know Davis, and that he had been in the latter's store only once—when Godfrey wished to purchase a toy for his child. Hamilton denied that he owed Johnson any

money or that Johnson ever delivered narcotics for him. He further denied that Johnson came to him on the morning of the day of the shooting to demand payment for a delivery or that he gave Johnson any narcotics at that time. He also said he did not direct Johnson to seek money from Davis. Indeed, he testified he did not see Johnson on the day of the shooting. Hamilton's testimony at the hearing below was consistent with his testimony at the original trial. Moreover, he is a close friend of the defendants. He was not reluctant to disclose his narcotics activities; and presumably he would not have been reluctant to confirm defendants' testimony at the hearing below if it were true.

The testimony of Barbara Molock and Geraldine Hatcher that on the day of the homicide Johnson was suffering from narcotics intoxication was far from persuasive. Miss Molock had never observed anyone under the influence of narcotics and merely testified that Johnson appeared sleepy. Miss Hatcher's description of Johnson as confused is equally consistent with the picture of a man who has recently killed another. The testimony of Allain Johnson, mother of defendant Johnson, did not corroborate defendants' new version of the homicide in any important respect. She merely testified that following his arrest, Johnson had a swollen lip and that he wanted to take the stand at his trial. As pointed out above, the evidence at the trial was overwhelming that defendants were not maltreated by the police, and the decision not to put defendants on the stand was a matter of trial tactics. Finally, we agree with the trial judge that the testimony of Jones, Cole, and Rodgers was completely unworthy of belief. All three are present or former prison inmates. Jones, apparently put on the stand to show that Davis was a dealer in narcotics, testified that while confined to the county pail Cassidy told him that he (Cassidy) owed Davis for drugs and that Davis cut off his supply until paid. This testimony apparently surprised even defense counsel who asked Jones if he was sure he was talking about Cassidy; for the latter testified later at the hearing that

he never knew Davis. Cole attempted to give the impression that he delivered narcotics for Davis. We agree with the trial judge that the conditions under which these deliveries were supposed to have been made were so ridiculous that his testimony lacked credence. Rodgers was a former inmate of the New Jersey State Mental Hospital, and life-long friend of the family of one of the defendants. He also implied that Davis was a narcotics dealer, although he had never bought any from him. He attempted to give the impression that he lived nearby Davis' toy store at the time of the homicide, but on cross-examination admitted that he had moved there three weeks before the hearing below. We agree with the trial judge that his testimony is inconsistent, contradictory and unworthy of belief.

 ■ At the hearing below, Johnson objected to the calling of Elmer Bertman, his counsel at the trial. The judge, however, quite properly permitted Bertman to testify, and the latter contradicted Johnson's testimony in an important respect. Bertman said that Johnson never told him that the visit to Davis' store was for the purpose of collecting a debt or that Davis was in the narcotics business. In addition, Bertman testified that before the trial he showed Johnson a copy of his confession and asked whether he could deny its contents; Johnson said he could not. It is also significant that at the hearing below neither Cassidy nor Godfrey testified they told their trial attorneys the visit to Davis' store was to collect a debt.

Finally, the testimony of the defendants at the hearing below lacks credence. They were confronted with their confessions varying from twenty-five to thirty pages in length. These contained long narrative statements which must have required considerable deliberation on the part of each defendant. At the hearing below, they readily recalled those parts of the confessions which harmonized with their new version of the homicide. But when confronted with those parts which conflicted with their new story, each failed to remember what he previously had said. It was these circum-

stances which led the trial judge to observe that each of the defendants had "developed a non-retentive memory."

The trial judge at the hearing below was confronted with two entirely different versions of the homicide. In exercising his discretion to grant a new trial, he necessarily had to weigh the credibility of defendants' evidence. His duty in that respect was described by the late Justice Cardozo as follows:

"* * * I do not mean that to justify a new trial, he must have been convinced—firmly or with a sense of certainty convinced—that the first story of the witnesses was false and that their new story was true. He might act upon a reasonable probability. But if, on the contrary, he was convinced that the second tale was false, that a criminal league had been formed to set at naught the verdict of the jury and the judgment of the court, his duty was clearly marked. * * * He was not at liberty to shift upon the shoulders of another jury his own responsibility. That would have been to make the conspiracy triumph. He was charged with a responsibility to seek the truth himself." *People v. Shilitano*, 218 *N. Y.* 161, 180, 112 *N. E.* 733, 739, *L. R. A.* 1916 *F.* 1044 (1916).

In the following language, the judge below concluded that the truth rests in the stories contained in defendants' confessions:

"To one charged with the administration of justice it is unwarranted to make the statement that perjury is forgiveable but in this case where the extreme penalty is involved it is understandable. This Court has been sympathetic to the plight of these three young men. It has searched for the truth. It is now convinced that substantial truth rests in the record of the original trial."

We agree with the judge's conclusion. The words of this court in *State v. Bunk*, 4 *N. J.* 482, 490 (1950) are here pertinent:

"If new trials were to be granted on such evidence as proffered here the number of times a new trial must be had would depend solely on a defendant's ingenuity, industry and imagination."

Our conclusion that the version of the homicide advanced at the hearing below is untrue makes it unneces-

sary for us to deal at length with defendants' argument that the State suppressed evidence favorable to their defense and that they failed to communicate effectively with trial counsel. It is enough to say that since we agree with the judge below that defendants' new version of the homicide was a post-conviction fabrication, we are satisfied that defendants did not inform the State that they were under the influence of narcotics at the time of the shooting and that the purpose of the visit to Davis' store was to collect a debt for narcotics delivery; and similarly, that they did not inform trial counsel of the alleged purpose of their visit. Additionally, defendants' contention that the State suppressed evidence is, under the circumstances, incongruous. The evil of suppression is concealment by the State of evidence which a defendant does not know and is entitled to know. See *United States ex rel. Thompson v. Dye,* 221 *F. 2d* 763, 767 (3 *Cir.* 1955). Here the defendants admit that they were the source of the evidence allegedly suppressed. Assuming their allegation to be true, defendants obviously knew of the so-called suppressed evidence.

### III.

Defendants were sentenced to death under *N. J. S.* 2*A*:113–4, which permits the jury to recommend life imprisonment when it returns a verdict of first degree murder. It provides:

"Every person convicted of murder in the first degree, his aiders, abettors, counselors and procurers, shall suffer death unless the jury shall by its verdict, and as a part thereof, upon and after the consideration of all the evidence, recommend life imprisonment, in which case this and no greater punishment shall be imposed."

Defendants argue that because the above statute contains no express standard to help the jury decide appropriate punishment it is unconstitutional. They cite no cases involving a similar question and we know of none. We note that the

majority of American jurisdictions have the same or a substantially similar statute. Knowlton, "Problems of Jury Discretion In Capital Cases," 101 *U. Pa. L. Rev.* 1099, 1099–1101 (1953). These statutes have withstood constitutional attack on other grounds. See, *e. g., Lindsey v. United States,* 77 *U. S. App. D. C.* 1, 133 *F. 2d* 368 (*D. C. Cir.* 1942), where the court, considering a District of Columbia statute which permitted the jury to recommend death in rape cases, rejected the argument that a defendant was constitutionally entitled to have sentence determined by a judge. And, see, *Puttkammer, Administration of Criminal Law,* 217 (1953); *Moreland, Criminal Procedure,* 302 (1959). A jury deciding whether to recommend life imprisonment under *N. J. S.* 2A:113–4 is guided by the same implied standard as a trial judge assessing punishment under any other criminal statute, *i. e.,* the determination of that sentence within statutory limits which best serves the interests of justice as between society and the defendant. See *State v. Mount,* 30 *N. J.* 195, 216 (1959); *Cf. In re Steenback,* 34 *N. J.* 89 (1961). Admittedly, that is a general standard, but the only one which is meaningful in this context. Additionally, we note that the jury's discretion under *N. J. S.* 2A:113–4 is not absolute. It is limited by the statutory mandate that a recommendation of life imprisonment must be based "upon and after consideration of all the evidence." *State v. White,* 27 *N. J.* 158, 167 (1958). A determination of what circumstances make the imposition of capital punishment unjust or unwise is left to the collective discretion and judgment of the jury, as, in other contexts, it is ordinarily left to the judge. That determination must be made upon the facts of a particular case. Indeed, legislative specification of criteria for recommendation of life imprisonment might prejudice a defendant through the exclusion by omission of a factor relevant in a given case. We hold that *N. J. S.* 2A:113–4 which gives to the jury the discretion to recommend life imprisonment where it returns a verdict of first degree murder is constitutional.

## IV.

Defendants' final argument is that under our decision in *State v. Mount*, 30 *N. J.* 195 (1959), published after their trial, they are entitled to a new trial so that they can introduce background evidence to assist the jury in determining whether a recommendation of life imprisonment is appropriate. In *Mount* the defendant was accused of killing a woman by stabbing her thirteen or fourteen times with a kitchen knife. The defendant in a statement to the police said that the victim, a neighbor, had rebuffed his advances and, after brooding about it, he followed her to the basement of the apartment house where they lived and "just went nuts and kept stabbing her." He was convicted of first degree murder without recommendation. At the trial the court admitted psychiatric testimony as to whether the defendant was capable of premeditating the crime, but excluded evidence that the defendant was brought up in a broken, immoral home and an orphanage. This court reversed on other grounds, but noted that on the facts of the case the defendant should be allowed at the retrial to introduce the proffered evidence of his background to assist the jury in assessing the appropriate punishment. The court noted that the scope and extent of such evidence to be admitted lies within the sound discretion of the trial court. In the present case, defendants did not specify at the hearing on their motion for a new trial what type of background evidence they wish to introduce. When asked by this court what evidence defendants would introduce if granted a new trial, defense counsel responded with a vague statement about their use of drugs. This evidence could have been introduced wholly apart from *Mount*. See *State v. White, supra*. The decision of defendants' trial counsel not to put them on the stand or introduce evidence in their behalf was motivated largely by the belief that the criminal records of two of them and their use of narcotics would adversely affect the assessment of punishment. Since there is no indication in the

record of the hearing on defendants' motion for a new trial of what background evidence they would introduce, and since their counsel's statement to us was uninformative, the defendants are not entitled to a new trial on this ground.

The action of the trial judge in denying the motion is affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.