NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1045-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

YUSEF B. ALLEN,

     Defendant-Appellant.

_____

> **APPROVED FOR PUBLICATION**
>
> **June 12, 2025**
>
> **APPELLATE DIVISION**

Submitted January 28, 2025 – Decided June 12, 2025

Before Judges Susswein, Perez Friscia and Bergman.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 98-08-1208.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Stephen W. Kirsch, Designated Counsel, on the brief).

William A. Daniel, Union County Prosecutor, attorney for respondent (Meredith L. Balo, Assistant Prosecutor, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

The opinion of the court was delivered by

SUSSWEIN, J.A.D.

Defendant Yusef B. Allen appeals an August 23, 2022 Law Division order denying his motion to overturn his 1999 murder conviction based on newly discovered evidence. This appeal affords an opportunity to clarify the legal principles that govern motions for a new trial based on evidence not previously available to the defense. Such motions can arise in two distinct circumstances: (1) where the prosecutor was in possession of the "new" evidence but failed to disclose it to the defense—a discovery violation; and (2) where the defense discovers the new evidence through its own efforts.[1] The circumstances presented in this appeal require us to consider the differences— and similarities—between the legal principles governing these two situations.

In <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), the United States Supreme Court addressed the first variation, holding that the Due Process Clause

---

[1] We note this variation does not require active post-trial investigation and can occur, for example, when someone comes forward and alerts the defendant to the existence of relevant evidence that they were not previously aware of.

requires the prosecution to disclose evidence favorable to the accused.[2]  Under

the Brady paradigm, the State's failure to comply with its discovery obligations

can in certain circumstances necessitate the grant of a new trial.  In State v.

Carter, 91 N.J. 86 (1982), our Supreme Court considered both situations and

devised what has been applied as a general test for resolving newly discovered

evidence motions.

The separate multi-prong tests set forth in Brady and Carter overlap but

are not identical.  Having two different tests can be a source of confusion, as

shown in the matter before us.  Here, defendant claimed the State committed a

Brady violation.  The motion judge, however, did not consider Brady in its

analysis and instead applied the Carter test.  The question before us is whether

the motion judge ultimately reached the correct conclusion notwithstanding

that it did not cite to the governing precedent.

Importantly, the Carter and Brady tests share a common element:  as a

prerequisite to the grant of a new trial, the reviewing court must determine

---

[2]  We stress at the outset the Brady doctrine must be applied in the context of the broad discovery obligations imposed on prosecutors under Rule 3:13-3, which is by no means limited to evidence and records that are exculpatory or otherwise favorable to the accused.  Indeed, the Rule has been described as establishing an "open file" discovery system whereby virtually all records and information in the prosecutor's possession must be disclosed, subject to the prosecutor's authority to apply for a protective order.  See State v. Hernandez, 225 N.J. 451, 453 (2016) (holding that "[t]his open file approach is intended to ensure fair and just trials").

whether the jury's verdict would have been different had the defense been aware of the new evidence before trial. The question of "materiality" under both Carter and Brady is essentially a form of harmless error analysis. See Carter, 91 N.J. at 113-14 (noting that "[t]he harmless error test explicated by the federal courts is whether the error was harmless beyond a reasonable doubt, namely, whether there was a 'reasonable possibility' that the error would have affected the result," and adding that, "[w]e choose to apply the harmless error criterion"). This common element in the Brady and Carter tests is critical to the resolution of this appeal. While the two tests start from a different factual predicate, they converge on the fact-sensitive question of whether the trial outcome would have been different if the defense had been aware of the new evidence before trial.

Turning specifically to the matter before us, in 1999, defendant was tried before a jury and convicted for murder and related weapons offenses. He has since filed numerous appeals in both state and federal courts. In his present challenge, defendant contends the prosecutor violated Brady by failing to disclose that a key State witness accepted a plea agreement tendered by the prosecutor in an unrelated matter in 1991—eight years before defendant's murder trial. Defendant also contends the motion judge erred by not enforcing

a defense subpoena to obtain information about possible payments from the Union County Crime Stoppers program to that State witness.

As we have noted, the motion judge did not specifically address defendant's <u>Brady</u> contention but instead analyzed defendant's newly discovered evidence motion under the test set forth in <u>Carter</u>. Still, the judge's findings allow us to evaluate the materiality element of the <u>Brady</u> test, which requires reversal of a conviction only where there is a reasonable probability that had the evidence suppressed by the prosecutor been timely disclosed to the defense, the trial result would have been different. <u>State v. Brown</u>, 236 N.J. 497, 518-19 (2019). After reviewing the record and the parties' arguments in light of <u>Brady</u> and its progeny, we affirm the denial of defendant's motion for a new trial.

We are not convinced, however, on whether a basis was demonstrated to enforce the defense subpoena regarding Crime Stoppers. Because the record before us is scant on the operations of that program and the records it maintains, we deem it prudent to remand for the motion judge to make additional findings of fact and conclusions of law.

I.

We discern the following pertinent facts and procedural history from the record:

 A-1045-22

## A.

## The Murder

On October 15, 1997, Lannie Silver was shot and killed at West Third Street and Prescott Place in Plainfield.  Earlier that day at around 6:00 a.m., Silver approached Ruby Waller—the witness at the center of this appeal—looking for a location to buy drugs.  Waller, who lived nearby and also wanted to purchase drugs, took Silver to a house on Prescott Place, "the Mack House." Waller proceeded to the front window of the house and sat on a bench below the window.  The window shade was drawn.  Waller placed an order for "four nickels" of crack-cocaine and slid [twenty dollars] through the window to a man she identified as Ben McNeil.[3]  After receiving the drugs, Waller stood up and moved away from the window, allowing Silver to sit on the bench.

Silver then asked Ben, "[w]hat you got[?]"  Ben "pulled the shade back and looked out the window" at Silver.  After seeing Silver, Ben and defendant exited the house as Ben yelled at Silver, "get the [F] out of here, [we] don't sell drugs [here], white mother [] f *****."  Silver tried to retreat from the porch with his hands in the air, repeating that he "just want[ed] to buy some drugs." Defendant and Ben followed Silver, yelling at him and using profane language.

---

[3]  Although she could not see his face, Waller testified that she could identify the voice of McNeil, her "little cousin's father."

A-1045-22

According to Waller, at one point defendant stated, "[h]old up, I got something for this mother [] f *****." Defendant then entered the house and returned "a second" later holding a gun "in his hand, down on the side."

Upon seeing defendant with a gun, Waller testified that she "ran" to her residence a short distance away. As she "approached the top stairs" to the house, Waller "heard a gunshot." Once inside the house she heard "several more" shots and "hear[d] the victim screaming." After entering her apartment, Waller testified that she looked out a window overlooking the intersection of West Third Street and Prescott Place. She saw Silver "trying to run" but fall to the ground after "the last shot hit him." Waller further testified that Silver tried to get up but could not and finally "crawled to the middle [of Prescott Place]" before collapsing. Waller indicated that the time between the first and last shots was "like a half a second."

Waller saw defendant and Ben running into the "Mack office," located close to the house where she had purchased drugs. Waller phoned 911 and reported the shooting to the police. She testified that "she might have" provided her name during the 911 call. Plainfield Police Department (PPD) Crime Scene Response Officers then arrived on scene. Officer Daniel Passarelli noted that there was a lot of blood, a gunshot wound to the victim's leg, and a chest wound. Passarelli asked Silver if he knew who shot him.

A-1045-22

Silver responded "[y]eah," but lost consciousness before identifying the shooter.

On October 27, 1997, Waller gave a statement to PPD Detective Francis Wilson and positively identified McNeil as the individual who sold her the drugs, and defendant as the other individual she saw on October 15. Waller testified that after the shooting she contacted the police again because she learned the victim had died. Waller admitted that if she had not heard about the victim's death, she would have remained quiet.

At trial, Waller testified that she was prosecuted and convicted of two cocaine possession offenses in 1990 and sentenced to a concurrent three-year term of probation. In 1991, she was convicted of another cocaine possession offense for which she received a three-year state prison sentence. Waller also admitted that she had a 1998 arrest for shoplifting that was pending at the time of defendant's trial. Waller testified that she did not expect or ask for any benefit in the shoplifting case as a result of her testimony.

Rhonda Whitfield, who was serving a sentence in the Middlesex Correctional Facility during the trial, testified that she was "[g]oing to buy a bag," that morning and saw the victim, Silver, "on the porch" of the house, "[l]ike talking to the screen." Only one person is permitted on the porch at a time, so Whitfield stayed on the street. As Silver was talking, defendant and

"Marvin" came out of the house. Whitfield was "dope sick" and paying "no mind," but "knew something wasn't right." She started to leave the area to buy drugs elsewhere when defendant and Marvin began "yelling" at Silver, who was "trying to walk" away. As Silver walked away, defendant was "running behind the guy," holding an object to his side. Whitfield then heard what she thought were "fire-crackers."

Bobby Harris, a high school student at the time of the shooting, testified on defendant's behalf. While Harris was walking his dog on the morning in question, he heard shots and saw that "dude about to fall." He turned around, ran home, but saw a white car "ride pas[t]."[4] He stated that he did not see the occupants of the vehicle nor any gunfire coming out of that car. The car drove past Harris about fifteen to twenty minutes later, but he did not look inside when an occupant yelled to him.

Cynthia Harrison testified for defendant that she saw the victim with a man named John Korman minutes before the shooting. Silver had asked Harrison "where to find cocaine," and she gave him directions to "the corner of Prescott." Police patrolled near that scene on that night but, according to the officer's testimony, Korman was never found.

---

[4] Waller also saw a van at the scene. She described the van as being blue and testified that it swerved to avoid hitting the victim as he lay in the street.

A-1045-22

Allen Mularez, a private investigator hired by the defense, testified that he and his partner interviewed Waller in December 1998. Mularez testified that Waller was cooperative. He also stated that Waller told him she never saw anybody with a gun during the incident. Mularez did not take a sworn statement from Waller.

B.

Procedural History

In 1998, defendant was charged by indictment with knowing/purposeful murder, N.J.S.A. 2C:11-3(a)(1), (2); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d); and third-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b).

In January 1999, defendant was tried by a jury and convicted on all three counts. On May 28, 1999, the trial court sentenced defendant to a term of life imprisonment, subject to an eighty-five percent term of parole ineligibility under the No Early Release Act, N.J.S.A. 2C:43-7.2. We affirmed the convictions on direct appeal but remanded for resentencing. State v. Allen (Allen I), 337 N.J. Super. 259 (App. Div. 2001). On remand, defendant was resentenced to life imprisonment with a thirty-year term of parole ineligibility. The Supreme Court denied certification. State v. Allen, 171 N.J. 43 (2002).

Defendant filed a petition for post-conviction relief (PCR) in 2002, which was denied in 2005 without an evidentiary hearing.  On March 4, 2008, we affirmed the PCR court's order as to most of defendant's claims.  State v. Allen (Allen II), 398 N.J. Super. 247, 253 (App. Div. 2008).  On two of defendant's contentions, however, we remanded for an evidentiary hearing (1) as to whether defense counsel had been ineffective in deciding to reject the trial judge's offer of a mistrial; and (2) to determine whether an affidavit from Korman constituted newly discovered exculpatory evidence that would warrant a new trial.  Ibid.  After an evidentiary hearing, the PCR court denied defendant's ineffective assistance of counsel claim in 2008.  The PCR court found Korman fabricated his affidavit and that it did not meet the standard for newly discovered evidence.

Defendant appealed that decision.  State v. Allen (Allen III), No. A-2532-08 (App. Div. Feb. 28, 2011) (slip op. at 1-2).  We affirmed as to the mistrial and Korman issues but remanded for an evidentiary hearing on defendant's self-represented contention that newly discovered evidence revealed Waller "knowingly lied at defendant's trial."  Allen III, slip op. at 23-25.  Retaining jurisdiction, we ordered the judge to consider this testimony and any other identified by defendant from a related federal drug prosecution trial, United States v. Mack, No. 00-323-02, 2019 WL 3297495 (D.N.J. July 23,

2019), and to determine whether it constitutes newly discovered evidence. Allen III, slip op. at 24-25. On remand, the PCR court found that it did not. We affirmed that decision, State v. Allen (Allen IV), No. A-2532-08 (App. Div. May 22, 2012) (slip op. at 9), and the Supreme Court denied certification, State v. Allen, 213 N.J. 567 (2013).[5]

In 2014, defendant filed a motion for a new trial based on newly discovered evidence which the motion judge denied without an evidentiary hearing. We reversed and remanded the case for reconsideration and refiling by defense counsel, holding:

> We have reviewed the record in view of these legal principles and are constrained to conclude that the motion judge failed to provide an adequate explanation for dismissing defendant's motion. The record suggests that the motion court essentially delegated to defense counsel the responsibility to determine the merits of defendant's contentions. There is no indication in the record that the court conducted its own review of defendant's contentions. Nor did the motion court address any of the factors that should be considered in deciding a motion for a new trial based on newly discovered evidence. See State v. Carter, 85 N.J. 300, 314 (1981) (delineating a three-factor test for courts to utilize in analyzing motions for a new trial based on newly discovered evidence). It is incumbent on the motion court to

---

[5] Defendant also filed a habeas petition in the United States District Court for the District of New Jersey on July 15, 2013. Allen v. Warren, No. 13-4304, 2016 WL 4649799 (D.N.J. Sept. 6, 2016), aff'd sub nom. Allen v. Adm'r New Jersey State Prison, 744 Fed. Appx. 68 (3d Cir. 2018).

> reach its own conclusions and not just incorporate by reference the conclusions made by assigned counsel. Accordingly, we reverse and remand so that the motion judge can make his own findings and state the reasons for his conclusions so as to permit appropriate appellate review if needed.
>
> [State v. Allen (Allen V), No. A-2192-17 (App. Div. April 14, 2020) (slip op. at 4).]

Defendant re-filed a motion for a new trial in 2022 and an amended supplemental self-represented brief which included new allegations that the State committed a Brady violation. Specifically, defendant stated that he became aware of information that Waller received favorable treatment from the prosecutor in a 1991 plea deal in exchange for her testimony against a co-defendant. Defense counsel at the motion for a new trial hearing noted that she was aware of Waller's prior convictions but not the plea agreement.

Additionally, during oral argument, defense counsel informed the judge that she tried to subpoena records from Crime Stoppers and the Union County Prosecutor's Office (UCPO) due to an allegation from defendant that Waller was paid money for her testimony. Defense counsel relayed that UCPO told her that Crime Stoppers would have the relevant information relating to any rewards given, and that Crime Stoppers then referred her back to UCPO. The State responded that UCPO was looking through its files to see if there was any information showing anything relating to Crime Stoppers. After denying

defendant's motion for a new trial[6] the judge declined to enforce the subpoenas but permitted counsel to file a motion for reconsideration should evidence come to light that Waller received some sort of payment.

On August 23, 2022, the motion judge issued an order and ten-page letter opinion. The judge found defendant's arguments for a new trial were "inadequate under the Carter test" and "merely speculation," noting:

> [T]he fact that [Waller] agreed to testify against a co-defendant in exchange for a favorable plea deal [eight] years ago has no relevance to the case at hand and was addressed at trial. Additionally, [Waller]'s motivation for serving as a witness in this case was explored during her testimony.

Defendant raises the following contentions for our consideration in his counseled brief:

> POINT I
>
> THE MOTION FOR A NEW TRIAL SHOULD HAVE BEEN GRANTED BECAUSE DEFENDANT PROVED EVERY PRONG OF THE MULTI-PRONGED TEST TO DEMONSTRATE A BRADY VIOLATION; THE JUDGE ANALYZED THE BRADY CLAIM UNDER THE WRONG LEGAL STANDARD; ALTERNATIVELY, EVEN IF THE MORE STRINGENT CARTER MATERIALITY STANDARD APPLIED, THE MOTION SHOULD

---

[6] A separate claim was made in defendant's motion for a new trial related to newly discovered evidence regarding McNeil, which the judge also denied. Defendant did not appeal that ruling.

HAVE BEEN GRANTED UNDER THAT STANDARD AS WELL.

POINT II

THE JUDGE COMMITTED REVERSIBLE ERROR BY REFUSING TO ENFORCE SUBPOENAS.

Defendant filed a self-represented brief raising the following contention:

POINT I

Motion Court Was In Error For Not Forcing By Way Of Subpoena The State To Turn Over Or Provide Information On Who Was The Person That Received The Reward Money And If It Was The State['s] Chief Witness [Waller].

II.

As we have noted, the motion judge addressed defendant's motion for a new trial applying the standards set forth in Carter, rather than Brady. We begin our review by comparing the two analytical frameworks.

In Carter, our Supreme Court explained that:

[T]o qualify as newly discovered evidence entitling a party to a new trial, the new evidence must be (1) material to the issue and not merely cumulative or impeaching or contradictory; (2) discovered since the trial and not discoverable by reasonable diligence beforehand; and (3) of the sort that would probably change the jury's verdict if a new trial were granted.

[85 N.J. at 314 (citing State v. Artis, 36 N.J. 538, 541 (1962)).]

15

Under the first prong of Carter, "[m]aterial evidence is any evidence that would 'have some bearing on the claims being advanced.'" State v. Ways, 180 N.J. 171, 188 (2004) (quoting State v. Henries, 306 N.J. Super. 512, 531 (App. Div. 1997)). "Determining whether evidence is 'merely cumulative['] . . . and, therefore, insufficient to justify the grant of a new trial requires an evaluation of the probable impact such evidence would have on a jury verdict." Id. at 188-89.

Under the second Carter prong, "the new evidence must have been discovered after completion of trial and must not have been discoverable earlier through the exercise of reasonable diligence." Id. at 192. Prong two "encourage[s] defendants and attorneys to act with reasonable dispatch in searching for evidence before the start of the trial." Ibid.

Finally, under prong three:[7]

> The characterization of evidence as "merely cumulative, or impeaching, or contradictory" is a judgment that such evidence is not of great significance and would probably not alter the outcome of a verdict. However, evidence that would have the probable effect of raising a reasonable doubt as to the

---

[7] We note the first and third prongs of the Carter test overlap, as both pertain to the probable effect the newly discovered evidence might have on a jury's verdict. In State v. Nash, our Supreme Court remarked, "[a]s is evident, under the Carter analysis, prongs one and three are inextricably intertwined." 212 N.J. 518, 549 (2013).

defendant's guilt would not be considered merely cumulative, impeaching, or contradictory.

[Id. at 189.]

In Brady, the United States Supreme Court held that a defendant's due process rights are violated when:  "(1) the evidence at issue [is] favorable to the [defendant], either as exculpatory or impeachment evidence; (2) the State must have suppressed the evidence, either purposely or inadvertently; and (3) the evidence must be material to the defendant's case."  Brown, 236 N.J. at 518.

The Brady rule is invoked when information is discovered after trial "which had been known to the prosecution but unknown to the defense." United States v. Agurs, 427 U.S. 97, 103 (1976).  The prosecutor is charged with knowledge of evidence in their file, "even if [they have] actually overlooked it."  Id. at 110.  By way of example, evidence impeaching the testimony of a government witness falls within the Brady rule when the reliability of the witness may be determinative of a criminal defendant's guilt or innocence.  Giglio v. United States, 405 U.S. 150 (1972).  Relatedly, the State's obligation to disclose is "not limited to evidence that affirmatively tends to establish a defendant's innocence but would include any information material and favorable to a defendant's cause even where the evidence

17

concerns only the credibility of a State's witness." State v. Carter, 69 N.J. 420, 433 (1976).

In Brady, the Court made clear that nondisclosure of evidence favorable to the accused violates the constitutional right of due process only "where the evidence is material to guilt or punishment." 373 U.S. at 87. See also Brown, 236 N.J. at 520. In making the often difficult determination of what is material, reviewing courts look to the factual circumstances of the particular case. Agurs, 427 U.S. at 103-04. "[E]vidence is 'material' if there is a 'reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" State v. Martini, 160 N.J. 248, 269 (1999) (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)). To evaluate materiality, the court must "'examine the circumstances under which the nondisclosure arose,' and '[t]he significance of a nondisclosure in the context of the entire record.'" Brown, 236 N.J. at 518-19 (alteration in original) (quoting State v. Marshall, 123 N.J. 1, 199-200 (1991)). "In determining the effect of the withheld evidence 'in the context of the entire record,' courts consider the strength of the State's case, the timing of disclosure of the withheld evidence, the relevance of the suppressed evidence, and the withheld evidence's admissibility." Id. at 519 (quoting Marshall, 123 N.J. at 200).

"Establishing materiality 'does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal.'"  Id. at 520 (quoting Kyles v. Whitely, 514 U.S. 419, 434 (1995)).  "Instead, the inquiry is 'whether in the absence of the undisclosed evidence the defendant received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'"  Ibid. (internal quotation marks omitted) (quoting State v. Nelson, 155 N.J. 487, 500 (1998)).  "Said another way, evidence is material if there is a 'reasonable probability' that timely production of the withheld evidence would have led to a different result at trial."  Ibid. (quoting Bagley, 473 U.S. at 682).

In Carter, our Supreme Court explained the Brady rule, clarifying that the "'might have affected the outcome of the trial' test is not translatable into the mere possibility that the undisclosed information might have helped the defense.  Otherwise, the test would call for automatic reversal.  There must be a real possibility that the evidence would have affected the result."  91 N.J. at 113.  The Court added, "[a]rguably, then, under the 'might have affected the outcome' test, the defendant must show more than a reasonable likelihood that the evidence could have changed the jury verdict."  Ibid.

We note the Brady rule is remedial.  It is designed to safeguard a defendant's right to a fair trial, not to punish the prosecutor.  As the Brady

Court emphasized, the guiding underlying principle "is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused. Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." 373 U.S. at 87. Stated another way, the remedy prescribed in Brady for a discovery violation revealed after a guilty verdict is essentially to put the defendant in the same position as if the prosecution had complied with its pretrial discovery obligations. That generally entails granting a new trial.

We also note that a prosecutor's suppression of Brady evidence "violates due process . . . irrespective of the good faith or bad faith of the State." State v. Landano, 271 N.J. Super. 1, 32 (App. Div. 1994) (quoting Brady, 373 U.S. at 87). Further, "[t]he prosecutor is charged with knowledge of evidence in [their] file." Carter, 91 N.J. at 111-12. "[A] prosecutor's constitutional obligation to provide exculpatory information 'extends to documents of which it is actually or constructively aware, including documents held by other law enforcement personnel who are part of the prosecution team,' because they are 'acting on the government's behalf in the case[.]'" State v. Washington, 453 N.J. Super. 164, 184 (App. Div. 2018) (first quoting State v. Robertson, 438 N.J. Super. 47, 69 (App. Div. 2014); and then quoting Kyles, 514 U.S. at 437).

20

As a general matter, it is long settled that a motion for a new trial based on newly discovered evidence "is addressed to the sound discretion of the trial court." State v. Johnson, 34 N.J. 212, 222 (1961). Thus, "[a] jury verdict rendered after a fair trial should not be disturbed except for the clearest of reasons." Ways, 180 N.J. at 187. We add that "issues of materiality under Brady are 'mixed question[s] of law and fact.'" Landano, 271 N.J. Super. at 37 n. 13 (alteration in the original) (quoting Carter v. Rafferty, 826 F.2d 1299, 1306 (3d Cir. 1987)). Accordingly, in this instance, we review the legal effect of the motion judge's findings de novo.

## III.

As we have noted, the analysis for a new trial under Carter and Brady differ. In Carter, our Supreme Court commented that "[w]hereas the test of materiality for the granting of a new trial under a Brady analysis is simply whether the suppressed evidence might have affected the outcome of the trial, . . . the test to be satisfied under a newly discovered evidence approach is more stringent." 85 N.J. at 314; see also Henries, 306 N.J. Super. at 534. We note the Carter test is more "stringent," not because it uses a more rigorous formulation of the harmless error principle but rather because it requires a threshold finding that the defense could not have discovered the evidence before trial through the exercise of due diligence. The due diligence

21                                                          A-1045-22

prerequisite is inapposite when there is a claimed discovery violation. Under Brady, the focus is not on what the defense might have discovered on its own but rather on the prosecutor's failure to disclose discoverable information in its possession. We reiterate and stress that "New Jersey provides a broad range of discovery to an accused in a criminal case under Rule 3:13-3. The open file approach is intended to ensure fair and just trials." Hernandez, 225 N.J. at 453.

Putting aside Carter's due diligence element, which is not part of the Brady test, we do not believe that the Carter test is more stringent than the one prescribed in Brady with respect to the question of materiality and whether the trial outcome would have been different if the evidence at issue had been disclosed to the defense prior to trial. Put differently, we see no practical difference between the materiality/harmless error elements set forth in the Brady and Carter formulations. Cf. Carter, 91 N.J. at 121 ("For the reasons outlined in our discussion of the Brady violation, we hold that [as to the motion for new trial based on newly discovered evidence] the evidence . . . is neither material nor of the sort that would lead to a change in the jury's verdict.").

Here, the motion judge did not consider Brady and made no findings, for example, with respect to the prosecutor's obligation to disclose to defendant

the plea deal it had made with Waller eight years earlier in an unrelated matter.[8] We see no point in remanding for the motion judge to make findings of fact and law with respect to the first two prongs of the Brady test. Rather, we assume if only for the sake of argument that the first two prongs of the Brady test have been satisfied, mindful that "[t]he partiality of a witness is subject to exploration at trial, and is always relevant as discrediting the witness and affecting the weight of his testimony." State v. Higgs, 253 N.J. 333, 361 (2023) (internal quotation marks omitted) (quoting Davis v. Alaska, 415 U.S. 308, 316 (1974)); see also State v. Nelson, 330 N.J. Super. 206 (App. Div. 2000) (holding that the failure to reveal in discovery that one of the prosecution's witnesses had a prior criminal conviction for sexual assault

---

[8] We reiterate that because defendant's contention is raised under the analytical framework established in Brady and not Carter, defendant was not required to establish the second prong of the Carter test, that is, the evidence at issue was not "discoverable by reasonable diligence beforehand." Carter, 85 N.J. at 314. We note in the interest of completeness that it is well understood that the overwhelming majority of convictions in this State are the result of guilty pleas rather than trial verdicts. So too it is well accepted that most guilty pleas are the product of negotiations between the prosecutor and the defendant. If the Carter paradigm were applied, the State would be free to argue that because defense counsel was aware of Waller's 1991 conviction, the reasonable diligence that Carter mandates would have required counsel to explore whether that conviction involved a negotiated agreement with the prosecutor. But again, because defendant's present claim arises under the Brady framework, defendant need not establish whether his trial counsel exercised reasonable diligence as a precondition to the grant of a new trial based on newly discovered evidence.

violated <u>Brady</u>).  We note the State acknowledges that "a requirement in [Waller's] 1991 plea agreement . . . could potentially impact the credibility of Waller in defendant's trial."

As to the second prong, the State does not argue that it did not have knowledge of the plea deal offered to Waller in the 1991 prosecution.  <u>See generally</u> <u>Kyles</u>, 514 U.S. at 437-38 (holding that a prosecutor is responsible to learn of evidence favorable to the defendant that is known to others acting on the government's behalf and vacating a conviction for failure to provide impeachment evidence of a government witness); <u>Nelson</u>, 330 N.J. Super. at 216 ("When the reliability of a witness may well be determinative of guilt or innocence, non-disclosure of evidence affecting credibility justifies a new trial, irrespective of the good faith or bad faith of the prosecution." (citing <u>Giglio</u>, 405 U.S. at 154)).

This case, however, turns on whether the trial outcome would have been different if Waller's 1991 plea deal had been disclosed to the defense so that it could be explored on her cross-examination.  Considering the motion judge's findings, we are satisfied that the newly discovered information would not have led to a different result.  The trial record shows that the defense vigorously challenged Waller's credibility based on her prior convictions and drug use.  The jury was made aware she was convicted of two separate cocaine

24

possession offenses in 1990 and that in 1991, she was convicted of possession of another cocaine offense. Waller also admitted that she had a 1998 arrest for shoplifting, which was pending at the time of defendant's trial. Waller further testified that she did not expect or ask for any benefit in the shoplifting case as a result of her testimony at defendant's murder trial. In light of her pending charge, we are persuaded that any incentive Waller may have had to testify against defendant to curry favor with the prosecutor was revealed to the jury.

We acknowledge there is no forensic evidence placing defendant at the crime scene. Nor did the victim make a deathbed identification of his assailant. But the State's case did not rely solely on Waller's testimony, which another witness, Whitfield, corroborated. Considering all relevant circumstances, we conclude there is not a reasonable probability that had the 1991 plea agreement been disclosed to the defense, the trial result would have been different. See Brown, 236 N.J. at 520.

IV.

We next turn our attention to defendant's contention the motion judge abused his discretion and violated defendant's due process and compulsory process rights by refusing to enforce the Crime Stoppers subpoena. In State v. Garcia, our Supreme Court explained:

> "The need to develop all relevant facts in the
> adversary system is both fundamental and

comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense."

[195 N.J. 192, 202 (2008) (quoting <u>Taylor v. Illinois</u>, 484 U.S. 400, 408-09 (1988)).]

Here, the motion judge quickly dispatched defendant's subpoena arguments, stating, "[d]efendant's allegation that [Waller] received a reward in exchange for her testimony is completely unsupported by any evidence." The judge told defendant he could file for reconsideration if evidence came to light that Waller received some sort of payment.

We are not satisfied that the motion judge provided adequate reasons explaining his decision. <u>See</u> <u>R.</u> 1:7-4. The purpose of the subpoena, after all, was to determine whether Waller received a cash reward for her cooperation. If defendant already had such evidence, presumably, he would not need to subpoena the program and prosecutor to learn whether such a reward had been made.

The record, moreover, is unclear on how Crime Stoppers operates and whether the decision to pay a reward is made by or with input from the

prosecutor.[9]  Nor did the motion judge make any findings with respect to what records are kept to document cash rewards.

In these circumstances, we deem it appropriate to remand for additional fact-finding.  We note the State argues in its appeal brief that the prosecutor "responded [to defendant's argument to the motion judge] that [the Union County Prosecutors Office] was looking through its files to see if there was any information showing anything relating to Crime Stoppers."  The State posits, "there is nothing in the record to show that the subpoenas had been ignored.  Rather, it would appear more likely that neither party found any

---

[9]  According to Union County Crime Stoppers' website, it is a non-profit run by a civilian board of directors offering money for information resulting in arrest and indictment/prosecution and the calls work as follows:

> Calls are received at the Crime Stoppers tips line . . . . This phone is a stand-alone instrument which does not provide caller ID, and conversations are not recorded.  The Crime Stoppers police or civilian [c]oordinator receiving the information completes the tips information form, makes initial inquiries and then passes the information to the investigating officer.  Calls are accepted regarding any publicized request for information, or any other crime(s) the caller has knowledge of.
>
> [How it Works, Union County Crime Stoppers (2025), http://www.uctip.org/sitemenu.aspx?P=howitworks&ID=723.]

A-1045-22

information concerning any payment made to Waller, which is why defense counsel never filed a [m]otion for [r]econsideration."

That may well be true, in which event the remand can be resolved by the motion judge in short order. However, we decline on this sparse record to speculate on whether a record of a reward payment to Waller exists.

In sum, we instruct the motion judge to make specific findings of fact and conclusions of law on whether defendant has the right in these circumstances to enforce the subpoena. If the judge determines after hearing from the prosecutor and program that no such records exist, the subpoena issue shall be deemed resolved. If the judge determines records that Waller received a payment do exist, the court shall enforce the subpoena subject to any arguments the State may make that the records should not be disclosed to defendant.[10]

Finally, we decline to put the cart before the proverbial horse by considering the potential impact that evidence of a cash reward paid to Waller would have under the Brady/Carter doctrines. We thus offer no opinion on whether and to what extent any such reward arrangement, if established, would constitute a material fact bearing on defendant's right to a new trial. Nor do

---

[10] We note the State in its appeal brief does not suggest the confidentiality of Crime Stoppers precludes disclosing reward payments.

we consider at this juncture whether any evidence Waller received a cash reward for her cooperation would be cumulative with the other evidence the defense used to challenge her credibility at trial. Rather, we leave that analysis for the motion judge to make in the first instance if and when evidence Waller received a cash reward is revealed.

Affirmed in part and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division